[No. 18323.  Department One.  April 23, 1924.]

PETER BOZANICH, *Respondent,* v. CHRIS OLSEN,
*Appellant.*[1]

FRAUDS, STATUTE OF (4)—PROMISE TO PAY DEBT OF ANOTHER—
ORIGINAL OR COLLATERAL PROMISE—EVIDENCE.  Where in negotiations
for a charter of a fishing boat, one of the parties promised to pay for
the charter, and the owner of the boat negotiated with such party
alone, relied on the promise and was led to understand that such
party was interested in and would have complete control of the
catch, and was thereby induced to and did render services, the
promise was on an original undertaking and not a contract to
answer for the debt of another within the statute of frauds.

Appeal from a judgment of the superior court for
King county, Carey J., entered April 7, 1923, upon
findings in favor of the plaintiff, in an action on con-
tract, tried to the court.  Affirmed.

*Roberts & Skeel* and *Tyre H. Hollander,* for appel-
lant.

*Hadley, Hay & Hadley,* for respondent.

PARKER, J.—The plaintiff, Bozanich, commenced this
action in the superior court for King county, seeking
recovery from John Hansen and Olaf Lystad as part-
ners, and Chris Olsen, doing business as Olsen Fish &
Cold Storage Company, of the sum of $2,750, as com-
pensation for the use and services of his boat in carry-
ing fish in Alaska waters during the fishing season of
1922.  Recovery is sought from Hansen and Lystad as
formal parties to the charter party for the boat, and
from Olsen upon the theory that he was in fact finan-
cially interested in the enterprise in which the boat
was used under the charter party, and because of such
financial interest, orally promised to pay Bozanich
compensation for such use of the boat.  A trial upon

[1] Reported in 225 Pac. 59.

the merits in the superior court, sitting without a jury, resulted in findings and judgment awarding to Bozanich recovery against each and all of the defendants in the sum of $2,138.50, and interest, from which Olsen has appealed to this court.

Our problem is, in substance, as to what oral promise, if any, was made by Olsen to Bozanich with reference to paying him for the use of the boat; and as to whether or not such promise was, in legal effect, an original undertaking by Olsen obligating him to pay Bozanich, or was only collateral to the obligation of Hansen and Lystad to ·pay Bozanich, and therefore within our statute of frauds requiring "every special promise to answer for the debt, default, or misdoings of another person" (Rem. Comp. Stat., § 5825) [P. C. § 7745], to be in writing. Counsel for Olsen contend that no promise of payment was made by Olsen, and that, in any event, such promise was no more than an oral promise to answer for the debt which might become owing from Hansen and Lystad to Bozanich for the use of the boat.

The evidence is conflicting as to the facts incident to the making of the alleged promise. A painstaking review of it, however, convinces us that the proven controlling facts may be summarized as follows: During the year 1922, and for some years prior thereto, Olsen, doing business as Olsen Fish & Cold Storage Company, was engaged in business in Seattle of the nature indicated by that name. In the spring of 1922, Hansen and Lystad, being experienced men in fishing and in the mild-curing of salmon, but evidently having very limited financial resources, entered into negotiations with Olsen looking to their going to Alaska and there obtaining and mild-curing salmon to be marketed by Olsen. On March 14, 1922, they and Olsen entered into a contract at Seattle by which he was to furnish them

certain supplies and make certain financial advances to them; they to sell to or through Olsen "their entire mild-cure pack for the year 1922 at market price, less five per cent commission to said Olsen," and also "pay interest to him at the rate of eight per cent on all advances made by him." To facilitate their work it was necessary that they have the use of a small vessel to convey the fish from different points in Alaska waters where the fish would be originally obtained, to such places where they could be shipped to Seattle. It was then thought desirable to procure such a vessel in Alaska, if that could be done, otherwise Olsen would have sent to them such a vessel.

Hansen and Lystad proceeded to Alaska and soon thereafter discovered that they could not procure a suitable vessel there. They communicated this fact to Olsen, who, learning of the possibility of chartering Bozanich's boat, which was suitable for the purpose, caused him to come from Bellingham, his home, to Seattle with a view of negotiations looking to the chartering of the boat. Hansen and Lystad were then in Alaska and entire strangers to Bozanich, having no established business or credit so far as Bozanich was advised. While Olsen was also in a sense a stranger to Bozanich, evidently he was known to Bozanich as having an established business in Seattle of some apparent magnitude. Under these circumstances, Olsen and Bozanich entered upon their negotiations. Bozanich seemed to want compensation for the boat from month to month, while Olsen insisted on him being compensated in a lump sum at the end of the season, and also that the charter for the boat be made in form between Bozanich and Hansen and Lystad. Bozanich expressed concern about payment for the use of the boat, especially if payment was to be wholly deferred until the

end of the season. Bozanich testified as to what was said by Olsen when they were negotiating, in part, as follows:

"Mr. Olsen said he would pay me $2,750 for the season. . . . When I came to Seattle from Bellingham, I had a conversation with Olsen the 12th of April. He said he would pay the charter-party. He made a contract. Olsen said he would pay me when I came back."

This testimony of Bozanich is contradicted by other testimony, and the probability of its truthfulness, it is argued, is impaired by his cross-examination. We think, however, in view of the attending circumstances, that the trial court was warranted in believing it as evidencing the substance of the promise there made by Olsen to Bozanich. Olsen explained to Bozanich in a way the arrangement he had with Hansen and Lystad and the interest he had in their season's undertaking, but evidently this was done in such a manner as to lead Bozanich to believe that the boat was to be used as much in his (Olsen's) interest as in the interest of Hansen and Lystad. It is not claimed that the formal contract of March 14th between Olsen and Hansen and Lystad was shown to Bozanich. What Bozanich learned of that contract was from Olsen's statement made to him with reference thereto. We think the evidence also warrants the conclusion that Olsen led Bozanich to understand that he would have in his possession the whole of the proceeds of the marketing of the fish. This, no doubt, created in the mind of Bozanich further assurance that Olsen would not only pay according to his promise, but would be able to pay. A charter party was then, May 12, 1922, drawn up in form between Bozanich and Hansen and Lystad, reading, so far as we need here notice its terms, as follows:

"Seattle, Washington,
"April 12, 1922.

"It is hereby mutually agreed by and between Peter Bozanich of South Bellingham, State of Washington, owner of that certain gasoline fishing vessel called the 'Arctic' of Seattle, Washington, of 25 net tons, and John Hansen and Olaf Lystad, both of Wrangell, District of Alaska, hereinafter called charterers.

"That the said owner agrees to let and the said charterers agree to hire the said vessel 'Arctic' for the term of five months from April 13, 1922, on the following terms and conditions: . . .

"The said vessel is to be employed by the charterers in carrying fish in Alaska waters between the points or places where such fish is taken on board, to such places as same are to be shipped to Seattle. . . .

"The charter price which the charterers agree to pay to the owner for the use of the said vessel and for the services of two men, namely, captain and engineer, who are furnished and paid by the owner, is to be twenty-seven hundred and fifty dollars ($2,750). . . .

"The charterers furnish all necessary fuel, oil and supplies necessary for the time and employment covered by this charter party.

"The charter price is to be paid at the close of the term of this agreement. . . ."

This form of charter party was then signed by Bozanich at Olsen's place of business in Seattle. It was the result of negotiations then had between Bozanich and Olsen alone, Bozanich having then never met Hansen or Lystad, who, as we have already noticed, were then in Alaska. It was understood by Bozanich and Olsen that he would immediately proceed to Alaska with his boat and report to Hansen and Lystad, where the charter party would be signed by them. Three copies were made of the charter party, one for each of the formal parties thereto and one for Olsen. This was according to the understanding between Olsen and Bozanich. Olsen's copy was sent to him after all copies

were signed. The record before us warrants the conclusion that during the season the boat rendered services during approximately a period of four months instead of five; that as a result of the work of Hansen and Lystad and the use of the boat there was shipped to Olsen at Seattle, in pursuance of arrangements above noticed, mild-cured salmon, and marketed by him, of the total value of several times that of the amount owing Bozanich for the use of his boat. This, however, seems to be of little consequence in view of the promise of payment made by Olsen to Bozanich, if it be in law a direct rather than a collateral promise.

Was Olsen's promise to Bozanich "a special promise to answer for the debt" which might become due to Bozanich from Hansen and Lystad for the use of the boat? We think it was not so within the meaning of our statute of frauds. The promise, if fulfilled, it may be conceded, would relieve Hansen and Lystad from their obligation to pay Bozanich for the use of the boat, but that is a mere incident which, as we view it, does not in the least affect Olsen's obligation to Bozanich arising from his direct, unconditional promise to pay Bozanich for a service which he manifestly led Bozanich to believe was to be rendered as much for him as for Hansen and Lystad, a promise but for the making of which Bozanich manifestly would not have ventured his whole season's services with his boat. We think the credit was by Bozanich extended directly to Olsen as much as to Hansen and Lystad. There is touching this problem, as was once somewhat tersely expressed by Chief Justice Dunbar, "a wilderness of authorities." With reference to this problem it is observed by the learned editors of Ruling Case Law (25 R. C. L. 481), that, "It may be safely stated that there is no subject of the law on which greater conflict in the authorities exists." The following general rule,

however, stated in the text of that work, seems sufficient for the solution of our present problem:

"In all cases, the question is whether the promise is in substance a promise to pay the debt of another, or whether it is a promise by the promisor to pay his own debt, the extent of which is measured by the amount due by another." 25 R. C. L. 496.

We think this was a promise on the part of Olsen to pay his own debt, supported by abundant valuable consideration. Our own decisions in *Gilmore v. Skookum Box Factory*, 20 Wash. 703, 56 Pac. 934; *Dimmick v. Collins*, 24 Wash. 78, 63 Pac. 1101; and *McKay v. Northern Bank & Trust Co.*, 69 Wash. 186, 124 Pac. 372, and *Lovell v. Haye*, 85 Wash. 109, 147 Pac. 632, lend support to our conclusion. Further support may be found in very pertinent observations made in *Bailey v. Marshall*, 174 Pa. St. 602, 34 Atl. 326; *Sharp v. Levan*, 236 Pa. St. 374, 84 Atl. 915; and *Cross v. Richardson*, 30 Vt. 641.

The judgment is affirmed.

MAIN, C. J., HOLCOMB, TOLMAN, and MACKINTOSH, JJ., concur.