[No. 21184.   Department Two.   July 27, 1928.]

DREW-WARREN RADIO ELECTRIC COMPANY, *Respondent,*
v. WESTERN LOAN & BUILDING COMPANY,
*Appellant.*[1]

[1] FRAUDS, STATUTE OF (4, 6)—PROMISE TO ANSWER FOR DEBT OF ANOTHER—ORIGINAL OR COLLATERAL PROMISE—NEW CONSIDERATION. Where a loan and building company, with loans on an apartment house, undertook to raise money to complete it, and had a direct interest in the installation and retention of radio equipment bought by the owner of the building, and which would tend to increase the revenues, there was a consideration for an oral agreement by the loan company to pay the balance due on a conditional sales contract of the radio, then only partly installed, sufficient to take the case out of the operation of Rem. Comp. Stat., § 5825, relating to oral promises to pay the debt of another; and it is immaterial whether the original promisor was discharged or not, as the oral promise was an original and not a collateral agreement.

[2] CORPORATIONS (162, 164)—ESTOPPEL TO DENY AUTHORITY OF AGENT—APPARENT AUTHORITY—ACCEPTANCE OF BENEFITS. One sent by a building and loan company having loans on an incompleted apartment house, and put in charge of the building subject only to directions of the vice-president and general manager, had authority to bind the company by an agreement to pay for radio equipment, contracted for and a benefit to the building, where the general manager had notice thereof.

Appeal from a judgment of the superior court for King county, Jones, J., entered November 18, 1927, upon findings in favor of the appellant, in an action on contract. Affirmed.

[1] Reported in 269 Pac. 496.

*Van Dyke & Thomas* and *Clarence L. Gere* (*James Ingebretsen,* of counsel), for appellant.

*S. H. Kelleran* (*A. L. Erickson,* of counsel), for respondent.

HOLCOMB, J.—Respondent sued to recover of appellant the sum of $1,920.75, the balance due upon the sale of a set of radio equipment installed in an apartment house belonging to F. F. Travis in Tacoma, for which the lower court gave respondent judgment. The contract price of the radio equipment was $3,051.85. $551.85 was agreed to be paid in cash as an initial payment and the balance to be paid in monthly installments of $270, with eight per cent interest by Travis. The initial payment was not made. At various times in January, February, and April, 1926, Travis paid upon the "lease contract" $493, which was credited to his account by respondent. Title to the radio equipment was reserved by a conditional sale and "lease contract" in the vendor until full payment of the purchase price.

Appellant had advanced $125,000 in two loans of $75,000 and $50,000 for the purpose of constructing the apartment house. At the request of appellant's mortgagor, respondent installed the equipment during construction under the "lease contract". Later, appellant and Travis found that $35,000 more was required to complete the building. The state supervisor of savings and loans objected to the placing of another loan to appellant on the incompleted building. Appellant then arranged with its president, R. W. Madsen, to advance the $35,000 needed on a third mortgage, it having been determined that that sum, with the returns which would be available from the finished portion of the building, would be sufficient to entirely finish the building.

The theory upon which respondent endeavors to hold appellant liable for the balance of the purchase price of the radio equipment, as alleged in the complaint, is briefly that in April, 1926, appellant took over the further construction of the building, and shortly thereafter respondent insisted upon payment and threatened legal action, if not paid; that appellant then entered into an agreement with respondent to the effect that respondent would retain certain loud speakers included in the radio equipment and credit the account of Travis and the "lease contract" with the whole cost price of the loud speakers, and would permit the remainder of the equipment to remain in the building and waive its claim to immediate payment and its right to legal action, in consideration of which appellant would adopt the contract and pay to respondent the balance which would remain due thereunder, payments to be in installments in such amounts as appellant might determine prior to October, 1926; and commencing with that date, and thereafter, at the rate provided in the "lease contract" of $270 per month; that the contract was adopted by appellant, partly by writing and partly by oral agreements, the persons representing the company in so doing being Joe C. Huff and V. R. Madsen, its vice president and general manager; that Huff thereupon in May, 1926, notified respondent that he had taken charge of the building and was working to the best advantage possible and would be able to reach the claim of respondent in the course of thirty days without fail, and that thereafter everything would be straightened out as rapidly as possible.

It was then alleged that the agreement to pay by appellant was made partly in writing and partly orally by Huff and Madsen, and that the consideration of the agreement was as hereinbefore stated. It was then

alleged that, in accordance with the agreement with appellant, respondent retained the loud speakers, which were of the whole value of $638.10, and thereafter, in conformity with the agreement, entered the credit against the "lease contract" of that amount on August 2, 1926, which credit, together with prior payments, left a balance then due of $1,920.75; that plaintiff permitted the remainder of the equipment to remain in the building, and waived its claim to immediate payment and its right to legal action otherwise, and fully performed the agreement on its part.

Issues were formed by an answer and affirmative defense and a reply to the affirmative defense, upon which issues trial was held to the court without a jury.

At the conclusion of the trial, the trial court made an oral memorandum decision, which succinctly summarizes and analyzes the issues and the evidence in the case and which we will here reproduce:

"I think this much is fairly definite, that some time in the early part of 1926, and after the execution of the mortgage by Travis to Mr. Madsen, this agent, Mr. Huff, gave assurance to the plaintiff here that he would take care of the contract. Later Mr. Huff wrote to the plaintiff on the stationery of the Western Loan & Building Company, and at the request of Mr. Drew, that he had taken charge of the building, was working everything to the best advantage possible, and he would be able to reach the Drew claim in the course of the next thirty days without failure, at which time 'I will do whatever possible. I can assure you the matter can be straightened out shortly thereafter.' At that time the third mortgage of Mr. Madsen had been filed and was a matter of record. Later in June, Mr. Haskell has an interview with Mr. Madsen, who was the vice-president of the defendant company, in which he testifies Madsen advised him that the Travis note will in time be paid in full. Mr. Madsen says two thousand dollars would finish the building, that they are foreclosing the mortgage, and during the year it takes

to foreclose they are going to apply the rent to the payment of such bills as the one in question, that there will be a small payment made in the next month, and at the end of ninety days the regular payment of $270 would be made regularly; that he is recognizing the lease contract and expects to pay it out. Now, those facts constitute the substance of the agreement on the part of the defendant to pay this debt. Mr. Huff, according to the testimony of the defendant, and that I believe is undisputed, came up from Salt Lake at the request of the third mortgagee to look after the distribution of this third mortgage fund. He was an auditor of the defendant company. Likewise Mr. Paskill was the agent, the local agent of the defendant company. Upon those two men was placed the burden of seeing to the proper distribution of the third mortgage fund. It happens that they were employees of the defendant.

"Now, in order to take this case out of the statute of frauds, and it is admitted that there is no sufficient writing to comply with the statute, it is necessary that there be a consideration for this promise, this oral promise. The defendant company had a mortgage on the property in question which was prior to the Madsen mortgage. It is not necessary for me to recite the conditions under which that Madsen mortgage was created, because there is no dispute about it. It does appear from the testimony that the mortgage company had desired and intended for reasons good and sufficient to itself to advance money on the third mortgage, but was stopped by the order of the state authorities, which forbade the placing of more building loan funds against that security. Then this other plan was adopted. I think it is fairly apparent that the reason that Mr. Madsen took a third mortgage here was to protect the interests of his company which was already involved in this uncompleted building. Then the question arises, what special interest did the defendant have in the future of this situation, was the defendant willing to merely stand upon its mortgage and not concern itself with the future, as to whether the building was completed or not? It apparently was not, because it had negotiated for and agreed to make the advance,

but instead of making it itself it procured—I should not say it procured, but as a result of the negotiations its president advanced the funds himself. I think that it did have a definite and positive interest in seeing that this building was completed and put upon a paying basis to the general end that, instead of an uncompleted building, there would be a perfected instrumentality .that, once perfected, could proceed to pay off and satisfy this mortgage. A community of interest between Mr. Madsen, the third mortgagee, and the company is further indicated in the instrument of February 27, I think, which speaks for itself, in which instrument the further disposition of the rentals from the building is arranged for.

"My conclusion is that there was at the time of this original conversation between Mr. Huff and the plaintiff such an interest on the part of the defendant corporation in the future of this building operation as would furnish a consideration for its alleged promise, and further, I am inclined to think that all of the testimony here suggests very strongly that Mr. Huff, Mr. Paskill, and of course later Mr. Madsen, at the time of his conversations with the bank in June of 1926, were acting for both the defendant and for Mr. Madsen, the third mortgagee. Now, we have no condition there that is as direct as that which existed in this lien case determined in 133 Washington. We have no showing that the plaintiff had a lien or had any pending claim that he was about to press into litigation. What we have is this, that the plaintiff had installed, in part at least, this radio equipment in the building, that it was of benefit to the building to keep it there, that it gave perhaps greater earning capacity to the building, rendering the several apartments in it either more easily rented or rented at a higher figure to have that facility, and the plaintiff at that time was claiming this property under a conditional bill of sale. While he doesn't testify that he made any threat that he would repossess the property, yet as a conditional vendor he potentially had such a right. Mr. Madsen on June 24 says that he is recognizing the lease contract and expects to pay them all up. So while we lack some of the features

that go to establish an express forbearance to take some act that would remove this property from the structure or the building, we do find that no act was taken by Mr. Drew or his company, that he ceased to go to Travis with demands for payment, and from that time on looked to the defendant for payment in accordance with the oral agreement made originally by Mr. Huff and subsequently confirmed by Madsen, in Madsen's conversation with Mr. Haskell of the bank.

"It is my conclusion that there was a sufficient consideration to hold the defendant to its promise, and the plaintiff will be entitled to judgment as prayed for."

In accordance with the memorandum opinion, the trial court made findings with some additions covering other matters shown at the trial, but which in substance accord with its memorandum. Conclusions and judgment consequently followed in favor of respondent. Exceptions were taken by appellant to all the findings and conclusions.

Appellant argues all assignments of error under two questions, stating they involve mixed questions of law and fact.

Its first question is: Was Huff an agent of appellant with authority to modify the conditional sales contract between respondent and Travis and to bind it by his promise to pay the balance due under the modification without compliance with the statute of frauds?

The second question stated is: Does the evidence in the case justify the trial court in holding that Madsen, the vice president and manager of appellant, adopted and ratified the alleged agreement of Huff to pay the Travis indebtedness to respondent without compliance with the statute of frauds?

[1] Appellant relies upon Rem. Comp. Stat., § 5825, subd. 2 [P. C. § 7745], which provides that every special promise to answer for the debt, default or misdoings of another person shall be void, unless such agreement, contract or promise, or some note or

memorandum thereof, be in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized. Appellant asserts that the trial judge thought this case was controlled by the decision in *Dybdahl v. Continental Lumber Co.,* 133 Wash. 81, 233 Pac. 10, but admitted that we have no condition here that is as direct as that which existed in that lien case.

Although appellant seeks to distinguish the *Dybdahl* case from this on its facts and the legal construction necessary to be drawn therefrom, we think the *Dybdahl* case very applicable here.

The trial court having heard the evidence and resolved it in favor of respondent as the record justifies, it must be taken as established that a personal benefit moved to the promisor—that is, appellant—of such a direct, personal and substantial character as to fairly justify and naturally induce the promisor to make the debt its own. In that case, it was decided that although a person having the right to a lien upon logs had not perfected his lien and this court held that no valid claim had been established against the logs, but viewing the circumstances and conditions existing there that the claim for lien, if pressed, would cause loss to the defendant by preventing it from realizing a profit on the sale of the logs, in consideration of the logger not prosecuting his claim, defendant agreed to pay the amount due the plaintiff from the original owner. We held that would be an original promise upon sufficient consideration and not within the statute of frauds.

In the instant case, respondent was pressing its claim and, if its conditional sale, or "lease contract" as it was designated, was valid, could reclaim the radio equipment. In any event, it could reclaim it as against Travis, the other party to the contract. The record

shows that it was to the direct benefit of appellant to keep the radios in the apartment and prevent respondent from enforcing his claim.  Appellant, therefore, for its own benefit agreed to pay the amount remaining due on the contract between Travis and respondent, less the cost price of any loud speakers not required, if respondent would not press its claim, regardless of whether the "lease contract" between Travis and respondent was valid and could have been enforced or not.  The evidence shows that Madsen, the general manager of appellant, several times stated that he "was recognizing the 'lease contract',"  although not recognizing lien claims filed subsequent to appellant's mortgages.

Hence, under the *Dybdahl* case, it is immaterial whether the "lease contract," because not filed according to law, was invalid and unenforceable as against appellant.  See, also, *Wells & Morris v. Brown,* 67 Wash. 351, 121 Pac. 828, Ann. Cas. 1913D 317; *Bicknell v. Henry,* 69 Wash. 408, 125 Pac. 156.

Appellant also cites cases holding void promises by a promisor to the effect that if another's debt should not be paid the promisor would pay, or would see that it was paid, or something of like effect.  But in this case, if the finding of the court as to the promise made by Huff and Madsen is correct, and we think it supported by sufficient evidence, then the promise was not a collateral promise or one of indemnity only, but a direct and absolute promise to pay.

This case therefore falls within the rule of *Goldie-Klenert Distributing Co. v. Bothwell,* 67 Wash. 264, 121 Pac. 60, Ann. Cas. 1913D 849; *Burns v. Bradford-Kennedy Lum. Co.,* 61 Wash. 276, 112 Pac. 359; *Davies v. Carey,* 72 Wash. 537, 130 Pac. 1137; *Guth v. First Nat. Bank of Odessa,* 137 Wash. 280, 242 Pac. 42.

We have also aligned ourselves with those courts,

whether in the majority or not, holding that the discharge of the original debt of the principal debtor is immaterial, when there is a consideration for the new promise. *Gilmore v. Skookum Box Factory*, 20 Wash. 703, 56 Pac. 934; *Bozanich v. Olsen*, 129 Wash. 333, 225 Pac. 59; *Guth v. First Nat'l Bank of Odessa, supra; Sperry Flour Co. v. Krehbeil*, 133 Wash. 673, 234 Pac. 1028.

[2] The first question stated by appellant has not been argued at length, as we consider it largely a question of fact, and if the fact therein stated is established, in which we concur with the trial court, there is not much of a law question left to decide.

However, an examination of the record shows that appellant put Huff in charge of the building in Tacoma, sending him from Salt Lake City for that purpose. He was placed over the so-called general agent of appellant in Tacoma. He had full charge of the building, subject only to the directions of the vice president and general manager Madsen, who also visited Tacoma and had conferences with a banker representing respondent; that the promises made by Madsen and Huff to the banker must be held to bind appellant is obvious. Thereafter appellant would be deemed estopped to deny the authority of Huff when left in charge of the property. *Hall v. Union Central Life Ins. Co.*, 23 Wash. 610, 63 Pac. 505, 83 Am. St. 844, 51 L. R. A. 288; *Colman v. Waterhouse & Co.*, 122 Wash. 259, 210 Pac. 387; *Wharton v. Tierney-Toner Co.*, 126 Wash. 216, 217 Pac. 998; *Stilwell v. Merriam Co.*, 127 Wash. 116, 219 Pac. 836.

We can find no valid reason for disturbing the judgment.

Affirmed.

FULLERTON, C. J., MAIN, BEALS, and ASKREN, JJ., concur.