593 P.2d 924

The TIMES MIRROR COMPANY, a California Corporation, and Jeppesen and Company, a Colorado Corporation, Appellants,

v.

Sylvia Jeanette SISK, surviving widow of Melvin Guy Sisk, Deceased, Rosalie Rhemann, surviving widow of Thomas Edward Rhemann, Deceased, Suzanne Ohnesorge, surviving widow of Ronald L. Ohnesorge, Deceased, and Pan American World Airways, Inc., Appellees.

No. 2 CA–CIV 2546.

Court of Appeals of Arizona, Division 2.

Dec. 12, 1978.

Rehearing Denied March 14, 1979.

Review Denied April 17, 1979.

Lesher, Kimble & Rucker, P. C. by William Kimble, Marvin Borodkin and Robert O. Lesher, Tucson, LaFollette, Johnson, Schroeter & DeHaas by Daren T. Johnson, Los Angeles, Cal., for appellants.

Barber, Haralson & Kinerk, P. C. by Burton J. Kinerk, Tucson, Byrd, Davis, Eisenberg & Clark by Tom H. Davis and Don L. Davis, Austin, Tex., for appellees.

## OPINION

HOWARD, Judge.

This lawsuit is a result of the crash of a Pan Am 707 cargo jet into Mt. Kamunay while approaching Manila International Airport in the Philippine Islands. The deceased were members of the crew who perished in the crash.

The parties stipulated that the trial was to be held in Pima County, that Colorado law governed liability and that Arizona law governed as to damages. The case was tried to a jury which returned a unanimous verdict in favor of appellants. The trial court subsequently entered judgment n. o. v. in favor of the appellees. Appellants claim the case should not have gone to the jury in the first instance and that in any event the court erred in granting judgment n. o. v.

The evidence in the light most favorable to the jury verdict is as follows. The United States and the Republic of the Philippines are treaty members of the International Civil Aviation Organization (ICAO). Each member nation decides who may fly into its airspace and what flight procedures will be authorized. An instrument approach into the Manila Airport was designed by the Philippine government's Civil Aviation Administration (CAA). When an ICAO member nation designs an instrument approach and authorizes its use in its airspace, it publishes the particulars of the approach in its Aeronautical Information Publication (AIP). The United States Federal Aviation Authority (FAA) determines which member nations of ICAO meet criteria acceptable to the United States in their management of airspace and flight procedures. Those nations found acceptable by the FAA are designated as having an "approved AIP". At all times material to this case, the Philippines had an approved AIP, by virtue of which the United States international "flag carriers", such as Pan Am, were authorized to permit their crews to "accept" any instrument approach so published.

The FAA receives the materials and the AIP of all countries as they are issued. If an instrument approach is published in an "accepted AIP" no further checking is made by the American government to verify that the approach meets any criteria.

The instrument approach which the Pan Am crew accepted on the day of the crash was known as a "VOR DME Runway 24" approach. This approach was first authorized by the Philippine government on April 30, 1970, when it was published in the Philippine AIP. Before such authorization, the

Philippine CAA designed the approach and set forth the details of how and when it should be flown. On October 29, 1969, the Philippine CAA mailed a complete description of the proposed approach to Pan Am, requesting any comment Pan Am might have. At that time, Pan Am aircraft, both scheduled and chartered, were regularly flying into and out of Manila International Airport. After Pan Am's management received and circulated this proposed approach among its technical people, including its route specialists and chief pilot, no comment was made to the Philippine government.

Appellant Jeppesen is engaged in the business of printing maps and charts which set forth the instrument approach procedures as specified by individual governments. Appellant Times Mirror is a party in this case because of its complete ownership of the Jeppesen & Co. stock.

Jeppesen does not design any instrument approach procedures. It simply depicts the procedures set by the governments on its own format. Jeppesen had a contract with Pan Am to provide it with instrument approach charts on the Jeppesen format, setting forth the requirements and procedures as designed, designated, and authorized by the particular government in its AIP. The contract required it to issue route manual services for Pan Am's overseas division and provide revision services. Jeppesen not only provides the manual to Pan Am but also distributes its Airway Manual worldwide to many thousands of subscribers.

The Jeppesen chart which graphically describes the VOR DME Runway 24 approach remained the same during the one year, two months and twenty-four days before the Pan Am 707 crashed on July 25, 1971. During that time, Pan Am and twenty other airlines flew into Manila Airport, and for that purpose purchased the instrument approach chart published by Jeppesen. During that time neither Pan Am nor any other airline or aircraft was involved in any accident while flying this approach. The chart which Jeppesen provided to Pan Am showed the location of various mountain peaks in the area but did not show Mt. Kamunay. Mt. Kamunay first appeared on the Philippine government's revision of the approach which was made after the accident occurred. After the accident, Pan Am did not reject the unrevised approach although it was free to do so.

The course specified for this instrument approach by the Philippine government in its AIP was over mountainous terrain. It was specified as a 241 degree course, which is in a southwesterly direction. This course led to a special radio transmitter at the airport used for the type of aerial navigation known by the initials VOR. The course began 23 nautical miles from the Manila Airport at a location designated by the name "Bangbang". Basically, the purpose of the VOR DME Runway 24 approach was to safely guide the airplane over the terrain to its landing at Manila. To accomplish this objective, the approach required the aircraft to fly along the course of 241 degrees at specified heights determined by the distance from the airfield. At the start of the approach at Bangbang the aircraft was not to be flown below the altitude of 7,000 feet above sea level. After crossing Bangbang it could be descended but not below 4,200 feet, until it had gotten a fix which indicated that it was at a point 20 miles from the airfield. Once it got that fix it could be further descended, but not below the altitude of 3,000 feet, until it arrived at the 17-mile point. Once it got a fix at the 17-mile point further descent could continue, but not below 2,500 feet, until it had a fix at the 12-mile point. As soon as it got its fix at the 12-mile point it could be further descended, but not below 1,400 feet, until it got a fix at the 7-mile point which was the "final approach fix" which meant it could be flown on down to landing.

On the day of the accident the aircraft, following the AIP, flew to the Bangbang intersection to begin the prescribed approach. When the plane crossed this 23-mile point the first officer said to the captain, "Okay, at 20 miles out you're clear down to 3,000 feet." The captain apparent-

ly interpreted this to mean he was then at 20 miles out and began his descent to 3,000 feet. When they arrived at the 20-mile point, they thought they were at the 17-mile point and began descending to 2,500 feet. After beginning their descent to 2,500 feet the airplane crashed into a ridge of Mt. Kamunay at a point 2,525 feet above sea level and a distance of 20 nautical miles from Manila Airport.

The top of Mt. Kamunay is located 19.7 nautical miles from the Manila Airport. It has an elevation of 3,173 feet and is 1.4 nautical miles to the left of the prescribed course. In addition to their mistake as to how far they were from Manila Airport, there was other evidence of negligence on the part of the crew. Pan Am's vice-president for flight standards testified that if the crew had followed the chart, and had not flown below the altitude specified in the chart, there would have been no accident. A pilot who had flown this approach in the Philippines on several occasions testified that on the basis of his experience it was a safe approach. Pan Am investigated the crash and came to the conclusion that it was caused by crew error.

Appellees' theory of liability was that of products liability, to-wit, strict liability under §§ 402A and 402B of the Restatement (Second) of Torts, and breach of warranty of fitness under the Uniform Commercial Code in effect in Colorado. They contended that the chart was defective and unreasonably dangerous. This contention is based on the theory that the minimum altitude between the 20-mile fix and the 17-mile fix should have remained at 4,200 feet instead of dropping to 3,000 feet, because Mt. Kamunay is at 19.7 miles and has an altitude of 3,173 feet, and the ICAO specifies a 1,000 foot safety factor and a 3% fix error.[1] This would have required a 4,200 foot minimum altitude between the 17-mile fix and a 20.6-mile fix.

The trial court, in its memorandum decision, adopted the following language of appellees' motion for judgment n. o. v.:

"The uncontradicted evidence in this case showed that at this time . . . the pilot was, in fact, flying the approach procedure depicted on Jeppesen's chart to the best of his ability. . . . His only mistake was that he thought he was 3 miles closer to the Manila Airport than he actually was. However, he was following the minimum altitudes on the Jeppesen chart, as he interpreted his distance from the VOR.

His mistake was in determining his distance, not in misinterpreting Jeppesen's chart or not adhering to its minimum altitudes. He was following the minimum altitudes shown on Jeppesen's chart. He was not ignoring them. Since he was in his own mind complying with these minimum altitudes, no reasonable mind could find that had the 3,000′ altitude shown on the chart he was using been 4,200′ (as it would have been had the mountain been shown), that he would have still descended to 3,000′.

The uncontradicted evidence in this case showed a dangerous defect in the Jeppesen approach chart, to-wit, the 3,000′ minimum altitude, between the 20 and 17 DME, that but for this defect, this crash would not have occurred."

The court, in granting the motion for judgment n. o. v., found liability under § 402A of the Restatement (Second) of Torts and under Colorado's Commercial Code, section 4–2–314(2)(c), C.R.S.1973.

Appellants contend that charts furnished by Jeppesen were not "products" or "goods" within the meaning of the Restatement (Second) of Torts, §§ 402A and 402B or under the Colorado Commercial Code. Although we have serious misgivings about whether this is a products liability case, we need not decide this issue because we find that the court erred in granting judgment n. o. v. in any event.

---

1. The ICAO treaty accords to each member nation the latitude to take into account their local conditions in relation to obstacle clearance limits. Each nation also decides whether the general ICAO specifications are or are not most suited to local conditions and whether they might prove unnecessarily restrictive.

The test for granting a motion for judgment n. o. v. is the same as that pertaining to the direction of a verdict during the trial. The evidence must be treated in a light most favorable to sustaining the jury's verdict. If there is any substantial evidence from which reasonable men could have found the ultimate facts to be such as to sustain the verdict, the motion for judgment n. o. v. should be denied. *In re Estate of Frick*, 13 Ariz.App. 247, 475 P.2d 732 (1970). On appeal from a judgment n. o. v., the appellate court will review the evidence to determine whether or not it was of such character that reasonable minds could differ as to the inferences to be drawn from the facts. *Adroit Supply Co. v. Electric Mutual Liability Insurance Co.*, 112 Ariz. 385, 542 P.2d 810 (1975).

The plaintiff in a products liability case seeking recovery under the doctrine of strict liability must show that the product in question was sold in a defective condition and was unreasonably dangerous to the user.[2] *Bradford v. Bendix-Westinghouse Auto. Air Brake Co.*, 33 Colo.App. 99, 517 P.2d 406 (1973). The Colorado court stated:

"Section 402A does recognize a defense for the manufacturer where the consumer or user mishandles or misuses the product and thereby *creates* the dangerous condition. Primarily, this defense is intended to protect the manufacturer from becoming an absolute insurer for all injuries arising out of the use of his product. The usual situation in which the defense will arise is where the product is being used in a way in which it was not intended to be used. However, a prerequisite for the defense is that the product must have been in a safe condition when it reached the user. If it was unreasonably dangerous at that time, the 'intervening' acts of the user can only be additional proximate causes making the two parties joint tortfeasors. See discussion of third-party complaint *infra*.

Of course, the defect in the product must itself be a proximate cause of the plaintiffs' injury before the plaintiff can recover. The manufacturer could not be held liable simply because of the existence of the defect when the real cause of the accident was the conduct of the user of the product. Only in this sense can the manufacturer be relieved of liability due to the acts of the user or a third party." (Emphasis in original) 517 P.2d at 413.

Under Colorado's Uniform Commercial Code, sections 4–2–314(2)(c) and 4–2–315, C.R.S.1973, there is a breach of implied warranty if the goods are not fit for the purposes for which they are used or for which they were purchased.

Restatement (Second) of Torts, § 402B states:

"One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though

(a) it is not made fraudulently or negligently, and

(b) the consumer has not bought the chattel from or entered into any contractual relation with the seller."

The applicability of § 402B was based on Jeppesen's representation that its approach charts contained "every necessary detail" and all "pertinent obstructions".

Since there was evidence that the approach as shown on Jeppesen's chart was safe if followed and that if the pilot had not gotten one step ahead of himself, the accident would not have happened, the following factual issues were for the jury's determination under appellees' theories of liability:

(1) Was the chart defective and unreasonably dangerous because it could not be

---

**2.** Restatement (Second) of Torts, § 402A states: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property . . . ."

safely used when the aircraft was off-course?

(2) Was the chart unfit for the purpose for which it was intended when it could not be used safely by an aircraft off-course?

(3) Was the chart being used for the purpose for which it was intended when it was being used by an aircraft which was off-course?

(4) Was the conduct of the crew the sole cause of the accident?

(5) Were Jeppesen's misrepresentations a proximate cause of the accident or was it solely caused by crew error?

These questions were peculiarly within the province of the jury. At the very least, reasonable jurors could differ as to the answers to these questions, thus precluding the court from granting judgment n. o. v.

Examination of appellees' reasoning, which was adopted by the trial court when it granted their motion, demonstrates that it is fatally flawed. Judgment n. o. v. could not be granted in this case without showing *conclusively* and *indisputably* that the chart was (1) defective, (2) unreasonably dangerous, and (3) a proximate cause of the accident. The record does not show that state of conclusiveness which would permit judgment n. o. v., i. e. that reasonable minds could not differ. In reality appellees' thinly disguised reasoning is "because-the-accident-happened-there-must-be-liability". It goes like this: (1) the plane hit the mountain; (2) had the minimum elevation between the 17-mile fix and the 20-mile fix been 4,200 feet the plane would not have hit the mountain; (3) therefore reasonable minds could not differ that the defect caused the accident; (4) therefore the chart contained a "dangerous defect"; and (5) therefore appellees are entitled to judgment n. o. v. This reasoning completely ignores the evidence of the crew's misuse of the chart and the evidence that the accident would not have happened if the pilot had not gotten one step ahead in his descent. Thus the jury was justified in finding either that any defect was not unreasonably dangerous or was not a proximate cause of the accident.

When appellees made their motion for judgment n. o. v. they also in the alternative asked for a new trial. The trial court, in granting the motion for judgment n. o. v., specifically stated in its order:

"In the event the judgment notwithstanding the verdict granted by this Court is hereafter vacated or reversed by the Appellate Court it is the determination of this Court that the motion for a new trial be denied, the Court being of the opinion that grounds do not exist therefor."

Appellees argue that the court could not grant the motion for judgment n. o. v. and at the same time deny their alternative motion for new trial because they claim such a ruling is inconsistent.

Rule 50(c), 16 A.R.C.P. states:

"(1) If the motion for judgment notwithstanding the verdict, provided for in subdivision (b) of this rule, is granted, the court shall also rule on the motion for new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial."

We first note that the trial court did not comply with Rule 50(c) by setting forth the grounds for denying the motion for new trial. Appellate review is made more difficult if the trial court fails to specify the grounds, contrary to the mandatory language of the rule. *Powell v. Lititz Mutual Insurance Company*, 419 F.2d 62 (5th Cir. 1969); Cf. *Ross v. Chesapeake & Ohio Railway Company*, 421 F.2d 328 (6th Cir. 1970). However, examination of the record, including appellees' conditional motion for a new trial, shows, and appellees concede, that denial of appellees' motion for new trial was directed towards appellees' contentions that a new trial should be granted because of the introduction of alleged irrelevant evidence and restriction in the voir dire of the jury. Appellees contend that since the trial court found that no reasonable jurors could disagree as to appellants' liability, such a finding necessarily includes a finding that

the jury's verdict is contrary to the weight of the evidence, therefore mandating a new trial. We do not agree. What the trial court was saying in its order was that if the appellate court finds there was a jury issue, then there was sufficient evidence upon which a jury could have arrived at a defense verdict.

 Appellees maintain that the trial court should have ruled that they were entitled to a new trial in any event. They argue the admission into evidence of the various acts of crew negligence was erroneous both because contributory negligence is not a defense in a products liability case and because the trial court refused to submit the defense of assumption of risk to the jury. We do not agree. We first note that appellees made no motion to strike the evidence after the court decided not to submit assumption of risk to the jury. Furthermore, such evidence was admissible to show that the crash was due solely to the negligence of the crew and not to any defect in the chart. *Swain v. Boeing Airplane Company*, 337 F.2d 940 (2nd Cir. 1964), cert. den., 380 U.S. 951, 85 S.Ct. 1083, 13 L.Ed.2d 969.

The order granting the motion for judgment n. o. v. is set aside and the trial court is ordered to enter judgment in favor of appellants.

RICHMOND, C. J., concurring.

HATHAWAY, Judge, specially concurring:

For the reasons given by the trial court in its memorandum decision as set forth in the majority's opinion, I believe that the information contained in the chart was a proximate cause of the crash. The unreasonably dangerous aspect of that information, however, was the design of the approach in not affording an appropriate margin of safety. Appellants are not responsible for the defectively designed approach. They are in the business of distributing information. The chart accurately set forth the information and I do not believe appellants should any more be held accountable for an unreasonably dangerous defect created by another than any other distributor of information. I concur in the result.