680 P.2d 1235

**RANCHO PESCADO, INC., Plaintiff-Appellant, Cross-Appellee,**

v.

**The NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, a corporation, Defendant-Appellee, Cross-Appellant.**

**No. 1 CA–CIV 5327.**

Court of Appeals of Arizona, Division 1, Department B.

Jan. 17, 1984.

Review Denied April 10, 1984.

Hofmann, Salcito & Stevens, P.A. by Leroy W. Hofmann, Phoenix, for plaintiff-appellant, cross-appellee.

Snell & Wilmer by Loren W. Counce, Jr., Douglas W. Seitz, and James P. Muehlberger, Phoenix, for defendant-appellee, cross-appellant.

## OPINION

GREER, Judge.

The main issues we determine in this appeal are whether the trial court erred by: 1) denying appellee's application to compel arbitration and, 2) reducing the jury's award of damages to appellant from $2,500,000 to $101,510, by denying the damages awarded for loss of future profits. The facts necessary to a resolution of this matter are as follows.

In 1971, James Jones (Jones) the president of appellant Rancho Pescado, Inc. (Rancho Pescado), became interested in and began studying the business of commercial catfish farming. He and his wife soon decided to enter the business for themselves.[1] Jones read a great deal of literature on the subject and visited many experts in the field throughout the country. He eventually decided that the Gila Bend Canal in Gila Bend, Arizona, would be an ideal location to raise catfish. Jones contemplated using the existing water in the canals in which to raise the catfish, using an intricate system of screens to separate the fish and control algae problems.

The Gila Bend Canal was owned by appellee Northwestern Mutual Life Insurance Company (Northwestern) and used to deliver underground water to a large ranch operated by a wholly owned subsidiary of Northwestern, Painted Rock Development

---

1. Fish farming is a form of aquaculture. The United States Department of Agriculture reported in 1978 that as many as 5,000 farmers nationwide raise fish for harvest. Farm Index, United States Department of Agriculture (1978). Not counting fish raised in hatcheries for stocking, farmers raised approximately 70,000,000 pounds of catfish in 1977. *Id.* Fish farming begins with the stocking of fingerlings (fish weighing only a few ounces each) into ponds or water raceways. The fingerlings are fed high protein pellets or mash, until they weigh one to one and one-half pounds. The feeding process takes approximately six weeks to complete. The feed-conversion ratio is much higher than other forms of animal raising, yielding approximately one pound of catfish for every two pounds of feed. The catfish are then harvested with nets and sold to restaurants or other businesses for marketing.

Company (Painted Rock). Jones explained his idea to Painted Rock in December, 1979, and made a proposal to conduct a pilot program to determine the feasibility of raising catfish in the canal. After conducting a brief experimental program with mixed results, Jones submitted a license agreement to Painted Rock for approval. That proposal, as well as subsequent ones, was rejected by Painted Rock for various reasons. Negotiations broke off between the parties in 1972, but began again in July, 1973. Finally, in December, 1973, a license agreement, granting Rancho Pescado the exclusive right to raise fish in a five mile portion of the canal for a period of five years, was entered into between Northwestern and Rancho Pescado.

Jones spent much of the first half of 1974 raising money to finance his operation and solving an algae problem in the canal. Jones stocked the first delivery of catfish fingerlings in the canal in August, 1974. On the day before Thanksgiving, 1974, Jones was notified by Painted Rock's water development supervisor that the water flow in the canal would be shut off, as usual, for the holidays. Jones complained and the water was eventually turned back on. Northwestern concluded that continued flow of water through the canal when not needed for Painted Rock's ranch operations, such as during the Thanksgiving and Christmas holidays, constituted a serious interference with Painted Rock's ranching operation. As such, on December 10, 1974, Northwestern notified Rancho Pescado by letter that it was terminating the license agreement for cause because Rancho Pescado's demand for continuous flow of water interfered with the ranching operations in violation of paragraph two of the license agreement. Northwestern concluded the letter by advising Rancho Pescado that it had until April 1, 1975 to remove its property.

On January 6, 1975, Rancho Pescado filed a complaint for damages, including loss of future profits, against Northwestern, alleging that Northwestern had breached the license agreement. Northwestern responded by filing a motion to compel arbitration as provided for in the license agreement, which the court denied. A separate individual complaint was also filed by Jones and subsequently consolidated with the one filed by Rancho Pescado. Trial by jury began on March 7, 1979. On April 24, 1979, Northwestern filed a motion for a directed verdict as to the personal claim of Jones and as to the claim by Rancho Pescado for lost profits. The court directed a verdict as to Jones but denied the motion against Rancho Pescado. Northwestern renewed its motion after both sides rested on May 8, 1979. The court again denied the motion. On May 10, 1979, the jury returned its verdict against Northwestern in the amount of $2,500,000. Northwestern subsequently filed a motion for new trial and a motion for judgment N.O.V. The court granted Northwestern's motion for judgment notwithstanding the verdict and reduced the amount of damages to $101,510, plus attorney's fees. The reduction in damage award represents the amount of damages awarded for loss of future profits. Rancho Pescado appealed the court's judgment notwithstanding the verdict and Northwestern cross-appealed on various issues, including the court's denial of its application for arbitration.

## I.

## ARBITRATION

Northwestern's main contention in its cross-appeal is that the trial court erred by denying its application for arbitration. In response, Rancho Pescado argues that arbitration was not mandatory but, assuming it was, Northwestern waived its right to arbitration by repudiating the contract. We decide this issue first, for if we reverse the court's ruling, we need not reach the other issues of this appeal.

◼ The trial court did not explain its reason for denying Northwestern's application for arbitration. However, we will affirm the trial court's decision if it is correct for any reason. *See Gary Outdoor Advertising Co. v. Sun Lodge, Inc.,* 133 Ariz.

240, 650 P.2d 1222 (1982); *Matter of Estate of Torstenson*, 125 Ariz. 373, 609 P.2d 1073 (App.1980).

Rancho Pescado contends that Northwestern was not entitled to invoke the arbitration clause because it repudiated the licensing agreement. A number of American jurisdictions have held that repudiation of a contract deprives the repudiating party of what would normally be his right to enforce the arbitration provisions of the contract. *Bertero v. Superior Court*, 216 Cal.App.2d 213, 30 Cal.Rptr. 719 (1963); *see also, Pisciotta v. Newspaper Enterprises*, 15 Misc.2d 354, 181 N.Y.S.2d 113 (1958); *see generally* 32 A.L.R.3d 377.[2] The cases are generally based upon the theory that repudiation of an entire contract acts as a waiver of the right to arbitrate. *Bertero v. Superior Court.*

*Bertero v. Superior Court* is a good example of a case where a party's repudiation of an entire contract was found to be a waiver of the right to arbitrate. In that case the president of National General Corporation terminated an employee by way of a letter stating, in part:

> The circumstances under which it [the employment agreement] was entered into render it invalid and unenforceable ....
>
> Moreover, the company has determined that in any event the agreement is invalid, unenforceable and an imposition upon the company and its shareholders.
>
> You are further notified thereby that in any event the company hereby terminates and cancels such agreement.

*Id.* 216 Cal.App.2d 213, 30 Cal.Rptr. at 721.

In holding that the company had repudiated the entire agreement and thereby waived its right to arbitrate, the court reasoned that, "to say in such a letter that the

contract 'is invalid and unenforceable' could mean only that it created no rights or duties which either party could stand upon." *Id.* 216 Cal.App.2d 213, 30 Cal. Rptr. at 724. Thus, the court's decision to deny arbitration was based upon the premise that it would be unfair for National General Corporation to benefit from one provision of the contract while simultaneously arguing that the entire contract was void *ab initio*.

As pointed out by the Ninth Circuit Court of Appeals in *Riess v. Murchison*, 384 F.2d 727 (9th Cir.1967), it is very important to distinguish between a repudiation of the entire contract, such as in *Bertero v. Superior Court*, and a repudiation or breach of one or more of the terms of the contract:

> For 'repudiation' is an elusive concept, and, as the researcher will find, can have various meanings, often confusing and seldom spelled out. Here, appellants do not contend that appellees have at any time waived or specifically repudiated the arbitration clause itself; indeed, the evidence suggests that appellees have consistently urged compliance with that clause. Rather, the 'repudiation' here charged relates to *other* contractual duties. More, specifically, the allegations spell out a *refusal to perform contractual obligations*. It is claimed that appellees (1) breached the contract in certain respects, and, (2) refused to render any future performance-conduct which, in combination, is asserted to constitute a 'repudiation of the contract.'

*Id.* 216 Cal.App.2d 213, 30 Cal.Rptr. at 733, (emphasis in original).

 Rancho Pescado claims that the December 10, 1974, letter[3] from North-

---

**2.** Our supreme court implicitly recognized that repudiation of a contract may amount to a waiver of the arbitration clause in *Bolo Corp. v. Homes & Son Construction Co.*, 105 Ariz. 343, 464 P.2d 788 (1970).

**3.** Gentlemen:

Reference is made to the License Agreement dated December 5, 1973, by and between The Northwestern Mutual Life Insurance Company

and Rancho Pescado, Inc. Paragraph 2 of said agreement provides, in part:

"Licensee will not hinder or interfere with farming operations and acknowledges that the irrigation canal system is the major source of water for such farming operations."

Paragraph 6 provides:

#6. Termination for Cause: The License Agreement may be terminated by Licensor in the event that:

western, terminating the licensing agreement, constituted a repudiation of the licensing agreement and therefore amounted to a waiver of the right to arbitrate. Whether the letter should be so construed is a question of law to be determined by this court. *See, e.g., LeBaron v. Crismon,* 100 Ariz. 206, 412 P.2d 705 (1966). In answering this question we are aided by our decision in *EFC Development Corp. v. F.F. Baugh Plumbing & Heating,* 24 Ariz. App. 566, 540 P.2d 185 (1975). In the instant case, the following issue was considered by the court: "May a party to a contract demand the arbitration rights thereunder when that party itself has breached, abandoned, or repudiated the contract without first asking for arbitration of its grievances?" *Id.* at 567, 540 P.2d at 186. In answering the inquiry in the affirmative, we reasoned:

> However, the very purpose of arbitration provisions would be defeated and their effectiveness severely limited if a party were held to have abandoned his arbitration rights merely because his actions might be construed to constitute a breach of the contract prior to the time he seeks a clarification of those rights through arbitration . . . .
>
> By its very nature the arbitration clause in the contract is distinct from other clauses. It is not to be considered as a clause in favor of one party or the other, the performance of which might be excused by the breach of other provi-

sions of the contract. Rather, the arbitration clause constitutes consent of the parties to establishment of extra-legal machinery for the settlement of their disputes. Even if we assume that appellees' action in reducing its work force constituted a breach of its obligations under the contracts, we find no merit in appellant's contention that such breach constituted an abandonment or repudiation so as to render the arbitration provisions of the contract unavailable to the appellee.

*Id.* Northwestern's letter is an attempt to terminate the license agreement for cause. This position may or may not be supported by the evidence. If not, Northwestern's action would be considered a breach of the agreement. However, as we stated in *EFC Development Corp,* such a breach does not constitute an abandonment or repudiation of the arbitration clause of the agreement. Thus, we cannot uphold the court's decision on this basis.

(1) Failure to take interlocutory appeal.

After hearing oral argument in this matter, we asked the parties to submit further briefs on the following two related issues:

1. Did Northwestern have the right under A.R.S. § 12–1201.01 to file an interlocutory appeal from the trial court's order denying its motion to arbitrate?

2. If so, has Northwestern waived its right to compel arbitration by failing to

(b) Any of the provisions of this License Agreement shall be breached by Licensee, and Licensee fails or refuses within twenty (20) days after written notice thereof to remedy the same.

You are hereby notified that you are hindering and interfering with our farming operations by demanding that we pump water into our canals when we have no requirement for water. In doing so, we are incurring a large expense in operating the pumps and we are wasting the water which cannot now be used to advantage in farming.

You are now aware and you were aware at the time this arrangement commenced that our farming operation is seasonal and that there are certain periods during the farming cycle when the pumps are shut down. We made no representation that we could make any special provi-

sions for your enterprise and we are unwilling to do so. The arrangement which we made was premised on your accommodation to our operations. You are now demanding that we accommodate to you, which we refuse to do.

The License Agreement is terminated for cause as of December 31, 1974. In accordance with the provisions of the agreement you will have the right to remove all of your fixtures, improvements, aquatic life within three months from the effective date of termination. All of your property must be removed from the premises prior to April 1, 1975.

Yours very truly,
THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY
By _____
Glenn Buzzard
Vice President

file an interlocutory appeal from such order?

■■■ A.R.S. § 12–2101.01(A)(1) provides that an appeal may be taken from an order denying an application to compel arbitration. In the instant case, the orders denying Northwestern's application to arbitrate were unsigned minute entry orders and were therefore not appealable without being formally entered by a signed written order. *See Johnson v. Nelson*, 128 Ariz. 587, 627 P.2d 1085 (App.1981). *See* Rule 58(a), Arizona Rules of Civil Procedure (judgment not effective until filed with clerk of court). However, either party could have placed the record in an appealable status by requesting the court to formalize its order denying Northwestern's application to arbitrate. *Howard P. Foley Co. v. Harris*, 4 Ariz.App. 294, 419 P.2d 735 (1966). Thus, the issue is whether Northwestern has waived its right to arbitrate by failing to take the necessary action to place the court's order in an appealable form and thereafter appealing.

■■■ Waiver of an arbitration agreement is generally not favored and the facts of each case must be viewed in light of the strong policy favoring arbitration. *See, e.g., Midwest Window Systems, Inc. v. Amcor Industries, Inc.*, 630 F.2d 535 (7th Cir.1980); *Mitsui & Co., (U.S.A.) v. C & H Refinery, Inc.*, 492 F.Supp. 115 (D.C.N.D. Cal.1980); *China Union Lines v. American Marine Underwriters*, 458 F.Supp. 132 (D.C.S.D.N.Y.1978). Once a party has given notice insisting on arbitration, the burden is heavy on the party seeking to prove waiver. *See General Guaranty Insurance Co. v. New Orleans General Agency Inc.*, 427 F.2d 924 (5th Cir.1970); *accord Martin Marietta Aluminum, Inc. v. General Electric Co.*, 586 F.2d 143 (9th Cir. 1978); *Hilti, Inc. v. Oldach*, 392 F.2d 368 (1st Cir.1968). This court has stated that the "basis of the finding of waiver of an arbitration provision is the showing of conduct inconsistent with utilization of the arbitration remedy—conduct showing an intent not to arbitrate." *EFC Development*

*Corp. v. FF Baugh Plumbing & Heating*, 24 Ariz.App. at 569, 540 P.2d at 188.

The case before us is a difficult one to decide. On the one hand, Northwestern actively and aggressively pursued its attempt to arbitrate. In January, 1975, prior to filing an answer to Rancho Pescado's complaint, Northwestern filed an application to compel arbitration and stay the proceedings. In September, 1977, Northwestern filed a motion for leave to file a counterclaim to recover damages resulting from Rancho Pescado's refusal to arbitrate. On March 5, 1979, two days before trial, Northwestern renewed its motion to compel arbitration. Finally, Northwestern raised the arbitration clause in support of its post-trial motions. Thus, it appears Northwestern's actions were taken with a view toward preserving its right to arbitrate. However, it admittedly failed to take two important steps, that is, formalizing the court's order and filing an appeal therefrom.

In *Bolo Corp. v. Homes and Sons Construction Co., supra*, our supreme court held that when the plaintiff filed suit in superior court, in lieu of the arbitration tribunal, it waived the right to thereafter arbitrate the same issue. The court reasoned that by "bringing an action in contract and attaching thereto a proceeding in garnishment, the plaintiff made a tactical election of remedy." 105 Ariz. at 347, 464 P.2d 792.

It is our view that Northwestern made a similar tactical election of remedy in the case at bar. It is apparent from the superior court and appellate briefs that the attorneys for each side spent a considerable amount of effort on this litigation. And, judging from the high quality of work, we must assume Northwestern was aware of its right to formalize the court's order and to appeal therefrom. Thus, it had a decision to make; either formalize the order and appeal, or maintain the status quo and proceed with trial. Had Northwestern truly intended to arbitrate, it was within its power to pursue an interlocutory appeal. Although Northwestern appeared to pre-

serve its right to arbitrate, once it decided not to take the necessary steps to appeal, it similarly made a tactical decision not to arbitrate. None of the subsequent pleadings which were filed can disguise that signal of its intent.

In *Wells v. Tanner Brothers Contracting Co.,* 103 Ariz. 217, 220, 439 P.2d 489, 492 (1968), our supreme court held that if no appeal is perfected from an order granting a new trial, the right to appeal would be deemed abandoned and could not be raised at the end of the second trial. To hold otherwise, the court continued, "would allow a party to have his cake and eat it too. One might then decide to retry every case envisioning the possibility of a larger verdict in the second trial." *Id.* This reasoning is equally applicable to the instant case. Were we to rule otherwise, there would never be a reason for a party desiring arbitration to make certain that the order denying its request was formalized by the trial judge. Instead, the party would simply take his chances at trial and, if not satisfied, thereafter appeal the order denying arbitration. This would allow the party an unfair second bite at the apple. This has never been one of the purposes behind arbitration or our Rules of Appellate Procedure and we will not now condone such action.

Our research of this issue has uncovered two Fifth Circuit Court of Appeals cases which reach a contrary holding. In *Sibley v. Tandy,* 543 F.2d 540, 542 (5th Cir.1976), the court, without discussion, cited to *General Guaranty Insurance Co. v. New Orleans General Agency Inc., supra,* in holding that the defendant did not waive its right to arbitrate "by failing to press an interlocutory appeal by the district judge's denial of its motion to stay arbitration."

■ In *General Guaranty,* General Guaranty Insurance Co. (GIC) sought an accounting and damages for breach of contract against New Orleans General Agency (NOGA). NOGA filed a motion seeking summary judgment, dismissal of the complaint for failure to state a claim, and, in the alternative, a stay pending arbitration.

In support of its motion for summary judgment, NOGA asserted that the contract sued on had been abandoned by mutual consent of the parties and superseded by another contract which had substituted another firm in the place and stead of NOGA. The alleged suprseding agreement did not contain an arbitration clause. The trial court denied NOGA's request for a stay because it found there was a possibility that the contract being sued on had been superseded by a contract not containing an arbitration clause, as NOGA alleged. If so, arbitration would not have been proper. A separate trial on the issue of abandonment was held, after which the court held there had not been an abandonment of the first contract. As to arbitration, the court found that NOGA had waived its right to arbitrate because it failed to request arbitration before suit was filed and allowed GIC to begin taking depositions before requesting arbitration. On appeal, the fifth circuit reversed, holding: "GIC's argument that failure to appeal was a waiver is a facet of its implicit theory of election. It misapprehends the usefulness of determining in court if there is an arbitration contract before sending the parties to arbitration." *Id.* at 930. In the instant case, however, the trial court did not propose to consider Rancho Pescado's contention that Northwestern had repudiated the arbitration clause and that therefore there was not a valid arbitration provision in existence. Instead, the court simply denied Northwestern's motion without stating a reason. Thus, unlike the *General Guaranty* case, as far as the parties to the case were concerned, there were no further arbitration issues to be decided at trial. In other words, the issue of Northwestern's right to arbitrate was ripe for appeal, whereas in General Guaranty the court had not yet determined whether the contract containing the arbitration provision was any longer in existence. Our holding should not be viewed as being in disfavor of arbitration. To the contrary, an opposite decision would abrogate the strong policy behind arbitration. The primary attraction of arbitration is an expeditious and

inexpensive method of dispute resolution. *Aerojet-General Corp. v. American Arbitration Association*, 478 F.2d 248 (9th Cir. 1973); *New Pueblo Constructors, Inc. v. Lake Patagonia Recreation Association, Inc.*, 12 Ariz.App. 13, 467 P.2d 88 (1970). Here, the two main incentives for arbitration are lost. It has been over eight years since suit was originally filed in this matter. Since that time a great deal of expense has been incurred by both parties and the state judicial system. It would make little sense to send this case back for arbitration at this late date.

■ In conclusion, we wish to emphasize that our holding is limited to the arbitration process. Arbitration is such an important element of dispute resolution that our legislature has deemed the formal denial of an application for arbitration to justify an interlocutory appeal. In light of the importance properly afforded to arbitration in our judicial system, and under the circumstances of this case, we find Northwestern's failure to perfect an interlocutory appeal to constitute a waiver of its right to arbitrate.

## II.

## DAMAGES FOR LOSS OF FUTURE PROFITS

The thrust of Rancho Pescado's argument on appeal is that the court erred by eliminating the jury's award of damages for loss of future profits and thereby reducing the overall damage award from $2,500,000 to $101,510. Rancho Pescado contends the jury's award of damages for anticipated future profits was soundly supported by the evidence. Northwestern contends that Arizona has adopted a per se rule which prohibits an award of damages for loss of future profits to a new business. Northwestern further contends that even if a per se rule is not used, Rancho Pescado failed to sustain its burden of proving loss of future profits with reasonable certainty.

■ The trial court reduced the jury's damage award by granting Northwestern's motion for judgment notwithstanding the verdict. The test to be used in determining whether to affirm a judgment notwithstanding the verdict is whether the evidence, if treated in the most favorable light to the verdict, is substantial enough that reasonable men could discern facts to support the verdict. *Kavanaugh v. Kavanaugh*, 131 Ariz. 344, 641 P.2d 258 (App. 1981); *Times Mirror Co. v. Sisk*, 122 Ariz. 174, 593 P.2d 924 (App.1978); *Bond v. Cartwright Little League, Inc.*, 112 Ariz. 9, 536 P.2d 697 (1975).

Until recently, the majority rule in this country prohibited a jury's verdict of damages for lost profits of a new business. *See, e.g., Fredonia Broadcasting Corp. v. RCA Corp.*, 569 F.2d 251 (5th Cir.1978), *cert. denied*, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978); *Mullen v. Brantley*, 213 Va. 765, 195 S.E.2d 696 (1973); *St. Paul at Chase Corp. v. The Manufacturer Life Insurance Co.*, 262 Md. 192, 278 A.2d 12 (1971); *Dieffenbach v. McIntyre*, 208 Okla. 163, 254 P.2d 346 (1952); *Taylor v. Shoemaker*, 34 Ala.App. 168, 38 So.2d 895 (1948); *see generally* Dunn, *Recovery of Damages for Lost Profits 2nd* § 4.1 (1981). These cases were generally decided on the basis that loss of profits from a new business was merely speculative and incapable of being ascertained with the requisite degree of certainty. *See Evergreen Amusement Corp. v. Milstead*, 206 Md. 610, 112 A.2d 901 (1955). Such reasoning is supported by the generally accepted rule of contract law that damages are not recoverable unless they are reasonably certain. 5 Corbin on Contracts §§ 1021–1022 (1964); Restatement of Contracts § 331 (1932).

Recent cases have eroded the once generally accepted rule against awarding damages for lost profits to a new business. The modern trend is to allow recovery for such lost profits if they can be proven with reasonable certainty. *See, e.g., Guard v. P & R Enterprises, Inc.*, 631 P.2d 1068 (Alaska 1981); *Chung v. Kaonohi Center Co.*, 62 Hawaii 594, 618 P.2d 283 (1980); *Cardinal Consulting Co. v. Circo Resorts, Inc.*, 297 N.W.2d 260 (Minn.1980); *Wyoming Bancorporation v. Bonham, Wyoming,*

563 P.2d 1382 (Wyo.1977); *S. John Kreedman & Co. v. Meyers Bros. Parking—Western Corp.*, 58 Cal.App.3d 173, 130 Cal. Rptr. 41 (1976); *Fera v. Village Plaza, Inc.*, 396 Mich. 639, 242 N.W.2d 372 (1976); *Vickers v. Wichita State University, Wichita*, 213 Kan. 614, 518 P.2d 512 (1974); *Smith Development Corp. v. Bilow Enterprises, Inc.*, 112 R.I. 203, 308 A.2d 477 (1973); *Brenneman v. Auto-Teria, Inc.*, 260 Or. 513, 491 P.2d 992 (1971). In *Chung*, the Hawaii Supreme Court reasoned that, "it would be grossly unfair to deny a plaintiff meaningful recovery for lack of a sufficient 'track record' where the plaintiff has been prevented from establishing such a record by defendant's actions." 618 P.2d at 291. And, in *Vickers*, the Kansas Supreme Court noted that to preclude recovery "as a matter of law merely because a business is newly established would encourage those contracting with such a business to breach their contracts." 213 Kan. at 620, 518 P.2d at ·517. The reasoning of these cases is highly persuasive.

■ This court has had two occasions to discuss the new business loss of profit rule. In *Earle M. Jorgensen Co. v. Tesmer Manufacturing Co.*, 10 Ariz.App. 445, 459 P.2d 533 (1969), we approved the modern view allowing recovery "where evidence is available to furnish a reasonably certain factual basis for computation of probable losses ... even where a new business is involved." *Id.* at 450, 459 P.2d at 538. The per se rule seemingly re-emerged in *China Doll Restaurant, Inc. v. Schweiger*, 119 Ariz. 315, 580 P.2d 776 (App.1978), in which this Court affirmed a summary judgment denying recovery for lost profits in a new business. We decline to follow *China Doll*, however, because the previous decision in *Earle M. Jorgensen v. Tesmer Manufacturing Co.*, was neither cited by counsel nor considered by the court in reaching its conclusion. We believe it would be patently unfair to deny damages to a business where they have been proved with reasonable certainty merely because the business venture was newly established.

■ Thus, the issue becomes whether the evidence introduced by Rancho Pescado, when considered in a light most favorable to upholding the jury verdict, established a reasonably certain factual basis for computation of lost profits. With reference to the evidence concerning lost profits, the principle is well established that once the fact of damages has been shown, the amount of damages may be established with proof of a lesser degree of certainty than required to establish the fact of damages. *Earle M. Jorgensen Co. v. Tesmer Manufacturing Co., supra.* However, there still must be a reasonable basis in the evidence for the trier of fact to fix computation when a dollar loss is claimed. *Nelson v. Cail*, 120 Ariz. 64, 583 P.2d 1384 (App.1978). The evidence required to prove loss of future profits depends on the individual circumstances of each case. *Chung v. Kaonohi Center Co.; Wyoming Bancorporation v. Bonham, Wyoming, supra.* While absolute certainty is not required, the court or jury must be guided by some rational standard in making an award.

■ In determining whether a plaintiff has met its burden of proof, courts have considered the profit history from a similar business operated by the plaintiff at a different location, *Guard v. P & R Enterprises, Inc.; Standard Machinery Co. v. Duncan Shaw Corp.*, 208 F.2d 61 (1st Cir.1953); *El Fredo Pizza, Inc. v. Roto-flex Oven Co.*, 199 Neb. 697, 261 N.W.2d 358 (1978), and the profit history from the business in question if it was successfully operated by someone else before the plaintiff took over. *General Electric Supply Co. v. Mt. Wheeler Power, Inc.*, 94 Nev. 766, 587 P.2d 1312 (Nev.1978). Neither method was available for use in the instant case. However, as is the case with an established business, *Lininger v. Dine Out Corp.*, 131 Ariz. 160, 639 P.2d 350 (App.1981), reasonable certainty may be provided when the plaintiff devises some reasonable method of computing his net loss.

In the instant case, Rancho Pescado had the burden of proving with reasonable certainty the fact that it could raise catfish in

the canal and that it could thereafter market them at a profit as well as proving with reasonable certainty how much profit it would have realized. On appeal, Rancho Pescado maintains it has met its burden on all accounts with uncontroverted evidence that it could successfully raise and market fifteen million pounds of channel catfish per year at a profit of twenty-five to thirty cents per pound. Our review of the record, however, places Rancho Pescado's evidence in a different light.

Initially, we note that various experts testified that catfish farming is an extremely risky business, even for experienced farmers. According to the United States Department of Agriculture estimates, the failure rate is approximately ninety-five percent. Of the five percent who succeed in fish farming, most are already experienced aquacultural farmers.

The record also shows that instead of the pond method used by ninety-five percent of all fish farmers, Rancho Pescado utilized a raceway system for raising its fish. Rancho Pescado points to the feasibility studies conducted by Jones which, it claims, shows it would have overcome the high failure rate in fish farming. The record, however, shows that Jones' pilot program was inadequate in a number of important respects, including its accuracy in predicting the systems effect on disease propagation, control and mortality rate; growth rate of the fish; conversion ratio of feed to flesh; and stocking density. These factors were all considered important factors by various experts in predicting Rancho Pescado's success or failure.

In a similar vein, there was evidence that another expert believed additional development work had to be completed before Rancho Pescado could successfully raise fish in the canal. Specifically, Dr. Lawler was concerned about the downstream fish living in the waste products flowing from the fish upstream.

As mentioned above, Rancho Pescado also had the burden of proving with reasonable certainty that it could market the fish it raised. Evidence on this point was based upon oral conversations and a letter from the president of Frosty Fish, a California fish distributor, which indicated it was willing to purchase Rancho Pescado's entire production of catfish, f.o.b. Rancho Pescado's operation at the Gila Bend canal. Initially, we note that the number of fish Rancho Pescado intended to produce and sell was an inordinately high number of catfish each year. For instance, its projection of eight million pounds of catfish per year would be approximately 11.42 percent of the entire crop of catfish harvested nationwide in 1977. Leo Ray, the most successful catfish farmer in the country, had previously succeeded in raising and selling only four hundred thousand pounds of fish in his best year, utilizing conventional methods at a facility designed and used solely for the purpose of raising fish.

It is not reasonably certain from the record that Frosty Fish would have actually been able to market all of Rancho Pescado's production. For instance, Frank Mateljan, Frosty Fish's president, testified that Frosty Fish typically distributed only one thousand pounds of catfish per week, an amount far below that which Rancho Pescado contemplated producing.[4] Mateljan also testified that he was not very close to the catfish market and had trouble selling catfish. When asked how he intended to distribute such a large quantity of catfish, he responded that he intended to sell a portion of it fresh, a portion of it frozen, and can the remainder. However, he admitted that he had never sold any canned catfish and had never heard of anyone who had. Most importantly, Mateljan testified that Frosty Fish was adjudicated bankrupt in 1976.[5]

4. Although Mateljan testified that his distribution rose to twelve thousand to fifteen thousand pounds per week at one point, it was only for a short period of time.

5. Although he stated that he thereafter continued to distribute fish personally and through a new corporation, all communications with Rancho Pescado were on behalf of Frosty Fish.

In conclusion, we view the evidence as a whole as amounting to nothing more than conjecture and speculation. The picture which emerges is one of an intelligent and enterprising individual who had an ambitious idea to take advantage of existing waterways to raise and sell catfish. However, the evidence is insufficient to prove that he would have succeeded in this highly risky industry. Although he had apparently done quite a bit of research into the catfish industry in general, his experiments on behalf of Rancho Pescado were woefully inadequate. Perhaps most damaging to Rancho Pescado's case is the lack of any conclusive evidence that it could have successfully marketed such large quantities of catfish. It is well settled that conjecture or speculation cannot provide the basis for an award of damages. The evidence must make an approximately accurate estimate possible. *Earle M. Jorgensen Co. v. Tesmer Manufacturing Co.,* *supra.* We are of the opinion that the jury did not have sufficient evidence to make a rational judgment as to the fact that Rancho Pescado would have been successful and if so as to the amount of lost future profits. Thus, the trial court properly granted Northwestern's motion for judgment notwithstanding the verdict.

### III.

### REMAINING ISSUES IN CROSS–APPEAL

The remaining issues in Northwestern's cross-appeal are discussed below.

#### A. Anticipatory repudiation.

The trial court ruled as a matter of law that Northwestern's letter of December 10, 1979, to Jones, constituted an anticipatory repudiation of the license agreement if Rancho Pescado regarded it as such. Northwestern claims this ruling is contrary to Arizona law because the letter did not express an unequivocal refusal to perform under the license agreement.

Northwestern is correct in pointing out that before an anticipatory repudiation will be found, there must be a "positive and unequivocal manifestation on the part of the repudiating party that he will not render the required performance when it is due." *McMahon v. Fiberglass Fabricators, Inc.,* 17 Ariz.App. 190, 192, 496 P.2d 616, 618 (1972). A mere implication that a party will not perform is not sufficient. *Id.* Northwestern contends that the letter in the instant case was equivocal because it afforded Rancho Pescado twenty days to cure its alleged interference with Northwestern's ranching operations. We disagree.

It is clear from a reading of the entire letter that Northwestern intended to terminate the license agreement because it believed Rancho Pescado was "hindering and interfering with [Northwestern's] farming operations by demanding that [it] pump water into [the] canals when [there] was no requirement for water." The letter concluded:

The license agreement is terminated for cause as of December 31, 1974. In accordance with the provisions of the agreement you will have the right to remove all of your fixtures, improvements, aquatic life within three months from the effective date of termination. All of your property must be removed from the premises prior to April 1, 1975.

The letter is unequivocal. It clearly terminated the license agreement for cause and demanded that Rancho Pescado remove all of its property from the premises. Although the letter did include a quotation from the termination clause of the license agreement, which included the twenty-day cure period, it does not appear from our reading of the letter that Northwestern was affording Rancho Pescado twenty days within which to cure the alleged breach.

Thus, because the letter did communicate a clear expression of Northwestern's intent to terminate the contract, the court's ruling was in accord with applicable Arizona law.

Moreover, Mateljan testified that he was semi-retired at the time of trial.

Northwestern also contends the court erred by giving jury instructions number fourteen and fifteen regarding its ruling on the anticipatory repudiation and by refusing to give its requested instruction number sixteen. Instruction number fourteen essentially instructed the jury that Northwestern's letter would constitute an anticipatory repudiation if regarded as such by Rancho Pescado. Instruction number fifteen instructed the jury that if Rancho Pescado expended efforts to have Northwestern withdraw its repudiation, such efforts would not constitute a defense to Northwestern. Northwestern claims the instructions are erroneous because they permitted the jury to find an anticipatory repudiation if Rancho Pescado *"regarded"* the letter as such rather than having *"treated"* it as such. Northwestern maintains that it was Rancho Pescado's actions which are significant, not its subjective intent.

 It is well settled that in determining whether a jury instruction is erroneous, the test is whether, when the instructions are considered as a whole, the jury will be able to determine the proper rules of law to be applied in arriving at its decision. *See, e.g., Kauffman v. Schroeder,* 116 Ariz. 104, 568 P.2d 411 (1977); *Arizona Public Service Co. v. Brittain,* 107 Ariz. 278, 486 P.2d 176 (1971). Northwestern is correct in its contention that it is Rancho Pescado's actions, and not its subjective intent, which must be considered by the jury. However, it is our opinion that the instructions, when read in their entirety, convey the correct legal instruction to the jury. For instance, the last paragraph of instruction number fourteen states: "conversely if you find that Rancho Pescado did not *treat* the license agreement as having been terminated by the December 10, 1974 letter, then a breach of the license agreement would not have occurred . . . ." (emphasis added). Instructions number fourteen and fifteen correctly state the law and adequately deal with the issue of Northwestern's anticipatory repudiation of the license agreement. Thus, there was no requirement for the court to give Northwestern's requested instruction on this matter. *Kauffman v. Schroeder, id.* (court need not give requested instruction adequately covered by other instructions).

## B. Miscellaneous jury instructions.

### 1) Instructions number seventeen and eighteen.

 Instructions number seventeen and eighteen deal with damages for breach of the license agreement. Northwestern contends they were given in error because the record is devoid of any evidence that it prevented Rancho Pescado from using the canal or rendered such use impossible. This contention overlooks the fact that the record contains evidence that water in the canal is shut off during the Thanksgiving holidays and that Northwestern refused to guarantee a constant flow of water after December 31, 1974. The instructions were reasonably supported by the evidence and therefore properly given. *Rodriguez v. Besser Co.,* 115 Ariz. 454, 565 P.2d 1315 (App.1977).

### 2) Instruction number sixteen.

 Instruction number sixteen informed the jury that there is an implied covenant of good faith and fair dealing in every agreement. Northwestern contends this instruction is incomplete and not supported by the evidence. Specifically, Northwestern contends that the instruction may mislead the jury into believing that the covenant of good faith may add additional essential terms to the agreement between the parties. We do not so read the instruction. The function of the jury instructions is to inform the jury of the applicable law in terms it can readily understand. *Noland v. Wootan,* 102 Ariz. 192, 427 P.2d 143 (1967); *Coyner Cropdusters v. Marsh,* 90 Ariz. 157, 367 P.2d 208 (1962).

### 3) Instruction number nineteen.

 Northwestern's objection to this instruction is based upon its misreading of the instruction. The instruction properly informs the jury that once a breach of a

188

contract is established, matters occurring subsequent thereto will not excuse that breach. We find no error.

4) Defendant's requested instructions number twelve and thirteen.

■ Defendant's requested instructions number twelve and thirteen were designed to instruct the jury that Northwestern had no duty to provide water of any certain temperature, depth or flow rate in the Gila Bend Canal during the term of the license agreement and that Rancho Pescado was to bear all risks of raising fish in the canal. The license agreement did not provide that Northwestern was or was not under any legal obligation to maintain any certain water conditions in the canal. However, under an implied covenant of good faith, Northwestern would, of course, have been obligated not to arbitrarily discontinue or affect the water flow so as to adversely affect Rancho Pescado's fish farming operations. The requested instructions did not make this fact clear and therefore might have misled the jury into believing that Rancho Pescado assumed all risks, including the risk that Northwestern would arbitrarily affect the water's flow. Therefore the trial court could have properly refused these instructions as being confusing to the jury. *Yellow Cab. Co. of Phoenix v. Green*, 16 Ariz.App. 485, 494 P.2d 385 (1972).

5) Defendant's requested instruction number seventeen and eighteen.

■ These instructions also dealt with damages. Instruction number seventeen was properly refused because it instructed the jury not to award any damages for loss of future profits. And, defendant's requested instruction number eighteen was properly refused because it was covered by instructions number twenty and twenty-one.

IV.

OPINION TESTIMONY

■ Northwestern contends that a number of expert witnesses were allowed

to improperly give opinion testimony. All such testimony, however, related to the issue of loss of future profits. Because this issue has been resolved in Northwestern's favor on appeal, any error in admitting the testimony is harmless and therefore does not require reversal.

V.

MISCONDUCT BY COUNSEL DURING CLOSING ARGUMENT

■ Northwestern maintains that various misconduct during closing argument by counsel for Rancho Pescado warranted the granting of a mistrial. Initially, Northwestern contends that Rancho Pescado's counsel improperly represented to the jury that Northwestern saved $40,000 a year in chemical costs because of the copper sulphate and tilapia programs instituted by Rancho Pescado. Northwestern maintains no such evidence was introduced at trial. However, the record shows that the witness Shelby Carl testified that Painted Rock purchased approximately $30,000 to $40,000 worth of copper sulphate a year prior to introduction of tilapia into the canal[6] by Rancho Pescado and did not purchase any copper sulphate after the tilapia program began. Thus, the statement made by counsel was supported by the evidence.

■ Northwestern also contends that Rancho Pescado's counsel improperly commented that Northwestern's counsel had fabricated evidence at trial. Even assuming these last two items are true, we are disinclined to reverse such a lengthy trial for such isolated statements of counsel where the trial judge did not feel a mistrial was warranted. The trial judge is allowed considerable discretion in controlling the conduct of a trial, and is best able to weigh the prejudicial effect upon the jury of any misconduct by counsel. *Betz v. Goff*, 5 Ariz.App. 404, 427 P.2d 538 (1972); *Tanner v. Pacioni*, 3 Ariz.App. 297, 413

6. Tilapia is a specie of fish sometimes used to control the growth of algae in fresh water.

P.2d 863 (1966). Thus, it has normally been held that the decision to grant a mistrial due to counsel's misconduct is within the trial court's discretion. *See McFarlin v. Hall*, 127 Ariz. 220, 619 P.2d 729 (1980). "That court has the whole picture and is better equipped to make such a judgment than an appellate court." *Id.* at 226, 619 P.2d at 735. We agree and will therefore not disturb the court's decision in this matter.

## VI.

### ATTORNEY'S FEES

 Northwestern finally contends that the trial court erred by awarding $85,-000 in attorney's fees to Rancho Pescado. Apparently a separate hearing was held to the court on this issue at which expert witnesses testified to the propriety of the requested amounts. However, as Rancho Pescado points out, Northwestern has failed to include in the record evidence received by the trial court in making its decision on this issue. It is, of course, the duty of the appealing party to insure that all necessary transcripts of evidence finds its way to this court. *Schuldes v. National Surety Corp.*, 27 Ariz.App. 611, 557 P.2d 543 (1976). Without such evidence we are unable to disturb the trial court's award.

Accordingly, the judgment of the trial court is hereby affirmed.

FROEB, P.J., and GRANT, J., concur.