[No. 36744. Department One. January 30, 1964.]

JAMES SPOSARI *et al., Respondents,* v. MATT MALASPINA AND COMPANY, INC. *et al., Appellants.**

*Reported in 388 P. (2d) 970.

*Lycette, Diamond & Sylvester* and *Lyle L. Iversen,* for appellants.

*Benson & Atwell,* for respondents.

HALE, J.—The best laid plans of a sewer construction may go awry. If the ditch happens upon an underground bog, an action at law is sure to follow. This is such a case.

Matt Malaspina & Company, Inc., as a prime contractor in competitive bidding, won the contract with the Lake City Sewer District to construct a sewer in King County. Matt Malaspina, president of and dominating figure in the company, had known James Sposari and Joseph Macri for many years. He knew them personally and as partners in the excavating business. He knew that their experience in putting in sewers, water pipes and utility lines underground came from smaller jobs for individuals and land developers and that they had insufficient capital to stand by themselves as subcontractors on his Lake City contract. He knew, too, that they had been in business together for more than 6 years and that their work and experience had shown them to be competent in excavation jobs, though of smaller scope than the subcontracts contemplated by the prime Lake City contract.

Sposari and Macri talked the matter of a subcontract over with Mr. Malaspina many times; they studied the contract carefully after its award to Malaspina & Company and made a bid on a part of it. They undertook to do all of the work and make all of the installations specified by the prime contract in the area between North 155th Street on the north and North 145th Street on the south, including installing sewers along Interlake, Wallingford and Meridian Avenues. They started the job about June 10, 1959.

During the first week of construction, they met their own payroll with money received from another job. In their second week, Mr. Malaspina advanced them $1,500 for their payroll, but cautioned them that thereafter they must look elsewhere for financing. The third week's payroll was met by Sposari and Macri with money taken in on a different contract, and later Mr. Malaspina, despite earlier warnings, advanced them an additional $2,000 by check with which to meet their current payroll. Subsequently, in about the sixth week of construction, Malaspina paid them by check for a small job they had done for him elsewhere.

On this last check he stopped payment, explaining to Sposari and Macri that he had learned they were not paying their bills for materials and supplies put into the Lake City contract. He said he had stopped payment on the check in self-protection as he would be held liable for these bills in the long run.

Aside from a scarcity of money on which to operate—a problem readily anticipated—Sposari and Macri ran into more serious obstacles. After finishing the sewer installation along Wallingford Avenue with fair speed, and while extending the sewer from a point in the plans marked "manhole 139" to another point called "manhole 148," they unexpectedly ran into an underground bog or swamp.

Their progress dropped, as they estimated it, from over 160 feet per day to 250 feet in two weeks. The ditch filled with water sometimes to a depth of 4 feet; in some places it caved in and widened; they installed well points and pumps, which, at times, they had their crews operate

around the clock. At other times, their crews had to stand by for several hours while the ditch area drained and dried. Mr. Malaspina said that they were tardy in putting in the well points and niggardly in operating the pumps, and that these blunders inexcusably forced the crew to stand idle at times during the regular day shift.

Malaspina, worried that the slow going in this sector would jeopardize his completion of the prime contract, pressed Sposari and Macri to speed up. He said that underground waters of this sort were to be expected and that, had Sposari and Macri put in well points and pumps early enough and kept them going day and night, the problems caused by the water would have been small. Sposari and Macri countered this, saying that they had taken all reasonable steps to keep the job moving and that, once through the bog, they would have easier going and could readily make up the lost time in the remaining portion of their part of the project.

Out of the swamp, or bog, emerged an enigma: Did Sposari and Macri give up the job, or did Malaspina take it away from them? From conflicting evidence, a jury decided that Mr. Malaspina had, in violation of his agreement, terminated Sposari and Macri and turned the unfinished part of their subcontract over to others. The jury awarded Sposari and Macri $13,500 against Matt Malaspina & Company, Inc., as damages for breach of contract.

From a judgment on this verdict, Malaspina & Company appeals; we will discuss two of the three assignments of error.

(1) Did the court err in excluding evidence of debts incurred by the plaintiffs for materials and supplies delivered to and put into the construction by them as subcontractors which debts the prime contractor orally promised to the creditors he would pay but had not paid?

(2) Did the court err in submitting to the jury the issue of anticipated profits?

On the point raised by the first assignment of error, Mr. Malaspina testified that the materialmen and suppliers had

all done business with him for many years on excellent terms. Many of them, he said, looked to him for assurances of payment for materials ordered by, delivered to, and put into the job by Sposari and Macri. He said that a number of these creditors would not have delivered such items as concrete and metal pipe, crushed gravel and timber, to the jobsite but for his promises to them that he would see to the payment of their invoices and, if necessary, would pay them himself. The court struck from the record and removed from the jury's consideration all invoices that were not actually paid by Malaspina. They came to a total of $3,521.09, owing and unpaid to five separate suppliers whom Malaspina had orally promised to pay if plaintiffs failed to do so. He now argues his own liability on these oral representations to these unpaid creditors as a proper offset to plaintiffs' claim for loss of expected profits, even though none of these creditors have been joined as parties or appeared as witnesses to prove their claims. Appellants assert error in the trial court's removal of these debts from the cause.

■   At the outset, the language of the statute of frauds gives us a clue to the proper decision. RCW 19.36.010(2).[1] If the promises made come within the meaning of the act as being special promises to answer for the debt default or misdoings of another person, and are not in writing, they are unenforceable against the promissor and, thus, not available as an offset in defense to an action for lost profits. In trying to determine if the promises are of such nature as to fall within the statute of frauds, we must ascertain if the oral promise was a direct, original agreement, constituting an undertaking on the part of the promissor to the creditor to pay for the materials, or whether it was

[1]"In the following cases, specified in this section, any agreement, contract and promise shall be void, unless such agreement, contract or promise, or some note or memorandum thereof, be in writing, and signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized, that is to say: . . . (2) Every special promise to answer for the debt, default, or misdoings of another person; . . . ." RCW 19.36.010(2).

merely a collateral agreement by the promissor to answer for the debts of another if the latter did not discharge them. If the promise is merely collateral, it comes within the statute. RCW 19.36.010(2). If, on the other hand, it falls within the first category and is a direct, original undertaking to pay for goods delivered to another, then the agreement created by the promise on the one side and the delivery of the goods on the other is, though made in parol, enforceable. *Stowell Lbr. Corp. v. Wyman,* 19 Wn. (2d) 487, 143 P. (2d) 457.

Our study of the evidence shows that, even in granting to appellants every inference favorable to the forming of an enforceable promise to pay the materialmen, the promises created no binding contract on their part arising solely for the promise and delivery of the goods. Malaspina's oral representations, that he would take care of the bills if they were not paid by respondents, we think, gave the suppliers no cause of action directly against him.

■ Assuming, arguendo, though, that appellants' oral representations to the materialmen place them in the status of guarantors—a position taken by them here—they would be bound to a conditional promise only, that is a promise to pay only if the respondents failed to do so. The undertaking, being thus conditional, imposed no liability upon appellants even though they were guarantors, until the creditors had exhausted their remedies against the purchasers. As to the creditors' accounts stricken by the trial court, no proof was presented other than appellants' declaration that Malaspina deemed himself and his company liable. 24 Am. Jur., Guaranty § 112. We have no proof that as to these particular claims the creditors ever sought enforcement or asserted any rights against Malaspina under the purported guaranty.

The materials involved were ordered by Sposari and Macri and delivered to them at the jobsite, and worked by them into the project. No creditors appeared at trial to declare that but for appellant Malaspina's assurances they would not have made the delivery; nor had any part of

the bills excluded by the court been paid by respondents. Thus, there was no evidence to submit to the jury that the assurances given by appellant Malaspina to the creditors were other than collateral promises, and promises thus collateral do not bring this case within our ruling in *Fairview Lbr. Co. v. Makos*, 44 Wn. (2d) 131, 265 P. (2d) 837. There, the promises were made directly to the suppliers in the presence of the purchaser after the supplier had announced that he would make no further deliveries on credit until his balance then due had been paid, and, in addition, the promissor actually paid a part of the bill then due.

In the instant case, the trial court had no basis in evidence to submit to the jury the issue of whether the appellant Malaspina had bound himself to pay the unpaid bills for materials. We should point out that the cases called to our attention which are said to hold otherwise (*Fairview Lbr. Co. v. Makos, supra; Dybdahl v. Continental Lbr. Co.*, 133 Wash. 81, 233 Pac. 10; *Drew-Warren Radio Elec. Co. v. Western Loan & Bldg. Co.*, 148 Wash. 435, 269 Pac. 496; and *Stowell Lbr. Corp. v. Wyman, supra*) are actions by the promisee against the promissor to enforce the promises and, hence, not controlling here.

■ When Mr. Malaspina asserts his liability for debts which he may never be required to pay, he brings the case into analogy with *Appleford v. Snake River Mining, Milling & Smelting Co.*, 122 Wash. 11, 210 Pac. 26, 29 A.L.R. 268. There, in an action for contributions by one guarantor against the maker and coguarantors on a promissory note, we denied recovery beyond the amount actually paid by plaintiff as guarantor, saying:

" . . . Since the respondent's action is not on the notes but on the implied promise of the maker of them to protect him, *his recovery can be only the amount which he was required to and did pay*, plus the legal rate of interest and without any attorney's fee. It would be inequitable for the respondent, as a guarantor, to recover of the maker of the notes a sum in excess of the amount *he has been required to pay*. For illustration, if the respondent had suc-

ceeded in compromising this claim, and had discharged the notes for less than the amount due, *he could not recover more than he had paid.* Any other rule would not be one of protection, but would permit the guarantor to speculate and make a profit out of his guaranty. . . ." (Italics ours.)

The trial court properly struck from the evidence proof of bills incurred by respondents but not paid by appellants.

Appellants next invite our attention to the assignment of error directed against submitting the issue of anticipated profits to the jury. They challenge the proof on this issue as being conjectural and below the requirement of reasonable certainty.

Here is the proof prima facie upon which respondents make their claim for loss of anticipated profits. Sposari and Macri proved that they had been partners in underground utility installation work since 1953, involving mostly smaller jobs for individuals or residential land developers. This was the largest contract undertaken by them. They studied the bids prepared by Malaspina & Company's estimator, personally inspected all areas of the proposed construction and studied the plans and specifications in detail.

They then broke their subcontract down into components by listing all of the materials to be used, the prices thereof based on quotations from suppliers and materialmen, the equipment to be employed and the crew thought necessary to operate it; from this latter estimate they figured the crew at hourly and daily rates and then added the costs of overhead and maintenance, and to the total they added 20 per cent for anticipated profit. Their estimates and computations they based in part upon their general experience in the business and their handling of the same types of equipment, crews and materials for over 6 years.

Sposari, for example, testified in detail as to the make up of his bid. He figured laying of pipe with a five-man crew at $1.09 per foot, to which he added the cost of pipe at $2.05 per foot, a figure obtained from the suppliers. He added 6 cents per foot for office overhead, 5 cents for insurance and another 5 cents for miscellaneous costs which in-

cluded gas and oil for trucks and equipment and the use of small tools.

His costs were broken down another way. Excavation was figured at $1.30 per foot, backfilling at 77 cents, grading at 10 cents and cleaning up at 5 cents a foot. They calculated the cost of installing each manhole separately as these varied in depth according to the plans and specifications.

To the estimated amount of materials, such as pipe, crushed gravel and timbering, necessarily going into the job, respondents applied the unit prices from the open market, and they correlated their total costs for materials, labor, supplies and equipment with estimates of the average number of feet of pipe they would expect to lay in a day. This last factor commonly referred to in the business as their "average daily footage" they figured at 160 feet in making up their bid.

They said that their profit on the entire subcontract figured at 20 per cent of their total costs would have come to $27,946.30, which, when included in their actual bid, gave them the final submitted figure of $140,000.

They presented proof that, before reaching the swamp, their daily footage came to just over 160 feet. Having a total of 330 feet of the inordinately wet area to traverse, they worked for 2 weeks installing 250 feet of pipe in it, but had only 80 feet more to go in that sector when Mr. Malaspina directed them to get off the project.

In submitting the issue of damages, the court instructed the jury that, if the defendant Malaspina wrongfully prevented plaintiffs from completing the contract, they would be entitled to recover the amount of profits they might reasonably be expected to earn on that part of the job they were prevented from performing.

Appellants denounce the anticipated profits as being illusory, uncertain and speculative in general and not susceptible of proof in particular because the contract on which they were computed was never performed, thus leaving the matter of profits a matter of pure guess. Appellants insist that the claim of loss of profits is made on a prediction of

20 per cent profits to be derived from evidence that shows respondents actually lost money on that part of the contract actually performed. Thus, in appellants' view, a claim of 20 per cent loss of profits on the total job—in the absence of expert testimony concerning the profits reasonably to be expected under all of the circumstances—resulted in a sheer guess by the jury.

Respondents counter this argument by showing the precise and detailed manner of preparing their bid and pointing to their considerable experience in this line of work, and urge that damages need not be proved with absolute certainty but only to a reasonable degree. They say that the evidence showed a probability that the time lost in running the ditch through the swamp could readily be made up in the remaining area where the going would be easier.

We accept appellants' statement that damages will not be allowed for loss of expected profits unless the loss be shown with reasonable certainty and a reasonable degree of accuracy, and that the testimony establishing the loss must be free of speculation and conjecture. *Automatic Canteen Co. of Washington v. Automatic Canteen Co. of America,* 182 Wash. 133, 45 P. (2d) 41; *DeHoney v. Gjarde,* 134 Wash. 647, 236 Pac. 290; *Brinnon Logging Co. v. Carlsborg Mill & Tbr. Co.,* 122 Wash. 483, 210 Pac. 945.

But we also acknowledge and give equal status to the correlative rule that, where an enterprise or undertaking in which profits were contemplated is thwarted by tortious misconduct or by reason of a breach of contract, the loss of anticipated profits, if proved with reasonable certainty, may be an item of damages occasioned by the tortious misconduct or breach of contract. Difficulty in ascertaining the damages, or uncertainty as to the amount, provides no basis in logic for denial *in toto.* If the evidence affords a reasonable basis for establishing the loss, an issue arises to be resolved by the trier of the facts. *Wenzler & Ward Plumbing & Heating Co. v. Sellen,* 53 Wn. (2d) 96, 330 P. (2d) 1068; *Gaasland Co. v. Hyak Lbr. & Millwork,* 42 Wn.

(2d) 705, 257 P. (2d) 784; *Dunseath v. Hallauer,* 41 Wn. (2d) 895, 253 P. (2d) 408.

■ We commend to this case the application of 1 Restatement, Contracts § 346:

" . . .

"(2) For a breach by one who has promised to pay for construction, if it is a partial breach the builder can get judgment for the instalment due, with interest; and if it is a total breach he can get judgment, with interest so far as permitted by the rules stated in § 337, for either

"(a) the entire contract price and compensation for unavoidable special harm that the defendant had reason to foresee when the contract was made, less instalments already paid and the cost of completion that the builder can reasonably save by not completing the work; . . ."

Explanation of this rule, as stated in the comment thereto, covers the instant situation:

"Another common form of stating the measure of recovery is as follows: Damages, measured by the builder's actual expenditure to date of breach less the value of materials on hand, plus the profit that he can prove with reasonable certainty would have been realized from full performance. This is a correct rule and is in fact the equivalent of the rule stated in Clause (a) of this Subsection, provided that all the elements that justly enter into the determination of cost of completion are considered in determining expected profits. . . ." 1 Restatement, Contracts § 346 Comment h.

Profits here would have been the total amount in dollars to be received by respondents from appellants for completing the contract, minus their total costs of completion.

Appellant Malaspina had every opportunity to meet respondents' estimates from which loss of profits were derived with proof showing that no profit could be realized or that respondents must inevitably have suffered a loss had they completed the job.

The detailed and explicit evidence of costs and expenses to complete the job—and from which respondents made their bid—considered in relation to a computed percentage thereof for profits, in our view, met the law's standards of

proof of damage to a reasonable certainty. And, in so doing, it gave rise to the issue of loss of expected profits, an issue, the ultimate decision of which rested with the jury.

Judgment affirmed.

OTT, C. J., HILL, ROSELLINI, and HUNTER, JJ., concur.

*Reported in 388 P. (2d) 965.