IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————

**ROY MCALISTER, ET AL.,**
*Plaintiffs/Appellants,*

*v.*

**LOEB & LOEB, LLP**,

*Defendant/Appellee.*

No. CV-24-0048-PR
Filed July 17, 2025

———————

Appeal from the Superior Court in Maricopa County
No. CV2018-012158
The Honorable M. Scott McCoy, Judge
**AFFIRMED AND REMANDED**

Memorandum Decision of the Court of Appeals, Division One
1 CA-CV 23-0212
Filed Feb. 1, 2024
**VACATED IN PART**

———————

COUNSEL:

B. Lance Entrekin (argued), The Entrekin Law Firm, Phoenix, Attorney for
Roy McAlister, et al.

Amy Abdo, Jessica L. Post (argued), Brett C. Gilmore, Fennemore Craig,
P.C., Phoenix, Attorneys for Loeb & Loeb, LLP

———————

JUSTICE KING authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER, VICE CHIEF JUSTICE LOPEZ, and JUSTICES BOLICK, BEENE, MONTGOMERY, and BERCH (RETIRED) joined.*

JUSTICE KING, Opinion of the Court:

¶1 In this case, we must determine whether plaintiffs seeking lost profit damages in the context of a prospective licensing transaction have satisfied their burden to prove those damages with reasonable certainty. We conclude that the plaintiffs have not met their burden, and the superior court properly granted summary judgment in favor of the defendant on lost profit damages.

¶2 We also granted review on the issue of whether a defendant's alleged electronic interference with patent applications can give rise to a claim for trespass to chattel. But we need not reach the merits of this issue. In this case, lost profits are the only form of damages the plaintiffs are seeking, and judgment was properly entered against them on such damages. Without any damages, the plaintiffs' trespass to chattel claim necessarily fails.

## BACKGROUND

### A. Factual Background

¶3 Roy McAlister invented and patented certain technologies relating to the sustainable production and use of clean fuels. In May 2009, McAlister incorporated McAlister Technologies, L.L.C. ("MT") to hold his patents and license the patents to others.

¶4 In October 2009, McAlister and MT entered into a "License Agreement" with Advanced Green Technologies, L.L.C. ("AGT"). The License Agreement provided that MT and McAlister would issue a license to AGT to develop and commercialize certain patents. In return, AGT

---

* Due to the retirement of Justice Robert Brutinel, pursuant to article 6, section 3 of the Arizona Constitution, Justice Rebecca White Berch (Ret.) of the Arizona Supreme Court was designated to sit in this matter.

would, among other things, issue McAlister a forty-one percent membership interest in AGT.

¶5 AGT retained a law firm, Loeb & Loeb, L.L.P., to assist with AGT's patent law matters. MT and McAlister allege that Loeb & Loeb also represented them at one time, although Loeb & Loeb disputes this claim.

¶6 Over the years, conflicts arose between McAlister and AGT's majority member. McAlister and MT sent letters to AGT claiming that AGT had materially breached the License Agreement, giving AGT an opportunity to cure the alleged breaches, and later terminating the License Agreement because AGT had purportedly not cured the breaches.

¶7 According to McAlister and MT, Loeb & Loeb then filed paperwork with the United States Patent and Trademark Office and the World Intellectual Property Organization indicating that AGT had rights in the patents and patents pending that were held by MT. McAlister and MT further contend that they entered negotiations with prospective licensees about licensing patents in various territories, but those prospective licensees declined to pursue the business opportunities after discovering that MT's patents and patents pending were "clouded."

## B. The Superior Court Proceedings

¶8 McAlister, his wife, and MT (collectively "Plaintiffs") filed this action against Loeb & Loeb, asserting claims for breach of fiduciary duty, trespass to chattel, slander of title, aiding and abetting, and negligent supervision.[1] Plaintiffs claim that Loeb & Loeb engaged in unlawful conduct that prevented the consummation of several prospective licensing deals and resulted in lost profits.

¶9 Plaintiffs proffered Ron Epperson as their expert witness on damages. Epperson considered testimony from the prospective licensees in his damages analysis. But Epperson himself acknowledged that MT was a new business venture and there were various significant risks with each prospective licensing deal. To account for these risks, he assigned a discount rate to each potential revenue stream, ultimately concluding that

---

[1] Plaintiffs did not name AGT as a defendant in this lawsuit.

Plaintiffs sustained over $100 million in lost profit damages in connection with four prospective licensing deals.

¶10        Loeb & Loeb moved to exclude Epperson's expert testimony, arguing that his opinions were speculative, relied on inaccurate assumptions, and lacked a reliable methodology.  Loeb & Loeb also moved for summary judgment on all Plaintiffs' claims and their alleged lost profit damages.  As to lost profit damages, Loeb & Loeb alleged that Plaintiffs did not present sufficient evidence to establish that its alleged conduct on behalf of AGT caused actual damages.

¶11        In addressing Loeb & Loeb's motion to exclude Epperson, the superior court identified various concerns with Epperson's methodology. The court noted Epperson's own acknowledgment of the various significant risks underlying Plaintiffs' prospective license deals, including that they sought to establish a $400 million-plus-per-year revenue business from scratch without any business plans, market analysis, or pro forma financials or projections.  The court also observed that (1) there was a high technology risk because Plaintiffs' technology had not been implemented at the scale envisioned; (2) the management team needed to execute the business opportunity was not yet identified; (3) the capital costs of production facilities using new technology were unknown (although Epperson ballparked the cost in the hundreds of millions), and it was unknown if the investors could fund those capital costs; and (4) the minimum license fee was large and placed significant risk on the licensee, and it was likely the licensee would seek a reduced or delayed payment in the event of execution delays.

¶12        The court stated that Epperson's use of a high discount rate did not "save the day," as his methodology "guarantees lost profits to any new business than can establish *any revenue*."  For example, Epperson testified that MT would be responsible in some capacity for assisting with commercializing the technology, but Epperson "apparently did not consider MT's expenses associated with performing its obligations under the proposed agreements."  Accordingly, the court determined that the danger of unfair prejudice and misleading the jury substantially outweighed any probative value of Epperson's lost profits model. *See* Ariz. R. Evid. 403.  In addition, the court concluded that Epperson's model was

"impermissibly speculative and would not help a jury" and excluded Epperson's expert testimony under Arizona Rule of Evidence 702.

¶13        The court also entered judgment in favor of Loeb & Loeb on Plaintiffs' alleged lost profit damages.  The court explained that a new business may recover lost profits "if they can be proven with reasonable certainty."  *See Rancho Pescado, Inc. v. Nw. Mut. Life Ins. Co.*, 140 Ariz. 174, 183 (App. 1984).  But the court determined that "no reasonable certainty exists" in this case because "[e]ach of the four nascent ventures featured: no signed contracts, no pro formas or other meaningful financial projections, no market analysis, no business plans, no technology proven beyond the laboratory, no management team, no production capability, and a $200 million price tag."  Given "these enormous, recognized risks," the court found it "speculative both that the parties would have ultimately reached terms and that any of these entities would be profitable."

¶14        Finally, the court granted summary judgment in favor of Loeb & Loeb on Plaintiffs' claims for trespass to chattel, slander of title, and aiding and abetting.  But the court denied summary judgment on Plaintiffs' claims for breach of fiduciary duty and negligent supervision.

¶15        After the court's rulings, Plaintiffs filed a notice stating that they would "not seek to offer at trial evidence of damages outside of the lost profits damages."  Plaintiffs further conceded that because "those lost profits damages have been dismissed, there are no triable damages left in the case."

¶16        The parties then filed a stipulation requesting final judgment against Plaintiffs and in favor of Loeb & Loeb on all claims in the case under Arizona Rule of Civil Procedure 54(c).  Shortly thereafter, the court entered final judgment under Rule 54(c) against Plaintiffs and in favor of Loeb & Loeb on all claims asserted in the complaint.

## C.    The Court Of Appeals

¶17        Plaintiffs appealed the superior court's exclusion of Epperson's testimony and entry of summary judgment in favor of Loeb & Loeb on lost profits, trespass to chattel, and slander of title.  *McAlister v. Loeb & Loeb, LLP*, No. 1 CA-CV 23-0212, 2024 WL 372214, at *1 ¶ 1 (Ariz. App. Feb. 1, 2024) (mem. decision).

5

¶18        The court of appeals affirmed the superior court's exclusion of Epperson's expert testimony on lost profit damages because his opinions "were based on speculation and unreliable methodology." *Id.* In addition, the court largely affirmed the entry of summary judgment on lost profits. *Id.* at *1 ¶ 1, *6 ¶¶ 34–35. But the court reversed the superior court's judgment on one portion of Plaintiffs' lost profit damages—that pertaining to an initial $5 million payment that one prospective licensee, Donal O'Flynn, testified he "was fine" paying to McAlister.[2] *Id.* at *7 ¶ 36. The court noted that "this testimony's credibility is called into doubt by the fact that O'Flynn did not consistently affirm this commitment in his multiple declarations over the course of this litigation," but "summary judgment cannot be granted based on credibility determinations."[3] *Id.* (citing *Orme Sch. v. Reeves*, 166 Ariz. 301, 309–10 (1990)). Plaintiffs, therefore, "were entitled to have the factfinder assess whether there is credible evidence that O'Flynn would have made an initial payment of $5 million with no specified contingencies." *Id.* ¶ 37. The court reversed and remanded "the summary judgment on damages to address the proposed [$5 million] initial-payment portion" from O'Flynn. *Id.* at *1 ¶ 2.

¶19        In addition, the court of appeals reversed the entry of summary judgment in favor of Loeb & Loeb on Plaintiffs' claims for trespass to chattel and slander of title. *Id.* The court remanded for further proceedings "on the trespass to chattel and slander of title claims, subject to the limitation on alleged damages." *Id.* at *10 ¶ 53.

¶20        We granted review to address lost profit damages in the context of a prospective business transaction, which is an issue of statewide importance that is likely to recur. We also granted review on whether electronic interference with a patent application can give rise to a trespass

---

[2] The court of appeals referred to the prospective licensing payments in U.S. Dollars. Certain portions of the record refer to the payments in U.S. Dollars and other portions refer to those payments in Euros. Because the particular currency is not relevant to the issues before us, we refer to the prospective licensing payments in U.S. Dollars.

[3] O'Flynn stated in one declaration that he was "willing and able . . . to pay the sum of €5 million as an initial down payment for the license," but he did not mention a $5 million or €5 million initial payment in his other declarations.

to chattel claim, an issue of first impression. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

**DISCUSSION**

¶21            "[W]e review a grant of summary judgment de novo, viewing the evidence in the light most favorable to the party against whom summary judgment was entered." *Dabush v. Seacret Direct LLC*, 250 Ariz. 264, 267 ¶ 10 (2021). Summary judgment is appropriate when "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). A motion for summary judgment "should be granted if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch.*, 166 Ariz. at 309.

A.        **Principles Of Lost Profit Damages**

¶22            This Court has long held that a plaintiff may recover damages for the loss of future profits caused by a defendant's tortious acts: "[W]here an enterprise or undertaking in which profits were contemplated is thwarted by tortious misconduct or by reason of a breach of contract, the loss of anticipated profits, if proved with reasonable certainty, may be an item of damages occasioned by the tortious misconduct or breach of contract." *Harris Cattle Co. v. Paradise Motors, Inc.*, 104 Ariz. 66, 68 (1968) (quoting *Sposari v. Matt Malaspina & Co.*, 388 P.2d 970, 975 (Wash. 1964)); *see also McNutt Oil & Refin. Co. v. D'Ascoli*, 79 Ariz. 28, 33–34 (1955); *Gilmore v. Cohen*, 95 Ariz. 34, 35–36 (1963).

¶23            The burden is on the plaintiff to show the amount of lost future profits "with reasonable certainty and a reasonable degree of accuracy." *Harris Cattle Co.*, 104 Ariz. at 68 (quoting *Sposari*, 388 P.2d at 975)); *see also McNutt Oil & Refin. Co.*, 79 Ariz. at 33 (explaining that a party is "entitled to recover any loss of profits which were capable of being proved with reasonable certainty which he suffered as a result of such breach"); *Gilmore*, 95 Ariz. at 36 (explaining that "[t]he burden was on the plaintiffs to show the amount of their [lost profit] damages with reasonable certainty"). "[W]hile mathematical accuracy is not required in proving loss of future profits such loss cannot be predicated upon conjecture or

speculation." *McNutt Oil & Refin. Co.*, 79 Ariz. at 34; *see also Harris Cattle Co.*, 104 Ariz. at 68 (explaining that "the testimony establishing the loss must be free of speculation and conjecture" (quoting *Sposari*, 388 P.2d at 975)).

**¶24**     In *Gilmore*, this Court explained that "'certainty in amount' of damages is not essential to recovery when the *fact* of damage is proven." 95 Ariz. at 36. But this rule "is simply a recognition that doubts as to the extent of the injury should be resolved in favor of the innocent plaintiff and against the wrongdoer." *Id.* It does not dispel the "requirement that the plaintiff's evidence provide some basis for estimating his loss." *Id.* And in fact, "[t]he requirement of 'reasonable certainty' in establishing the amount of damages applies with added force where a loss of future profits is alleged." *Id.* This is "because such loss is capable of proof more closely approximating 'mathematical precision.'" *Id.* "In other words, the plaintiff in every case should supply some reasonable basis for computing the amount of damage and must do so with such precision as, from the nature of his claim and the available evidence, is possible." *Id.*

**¶25**     At one time, "the majority rule in this country prohibited a jury's verdict of damages for lost profits of a new business." *Rancho Pescado*, 140 Ariz. at 183 (collecting cases). But more recent case law has "eroded the once generally accepted rule against awarding damages for lost profits to a new business." *Id.* at 183–84 (collecting cases). As the court of appeals explained in *Rancho Pescado*, "[t]he modern trend is to allow recovery for such lost profits if they can be proven with reasonable certainty." *Id.* We agree with *Rancho Pescado*'s pronouncement that "it would be patently unfair to deny damages to a business where they have been proved with reasonable certainty merely because the business venture was newly established." *Id.* at 184. Indeed, "[t]he evidence required to prove loss of future profits depends on the individual circumstances of each case." *Id.*

**¶26**     Accordingly, a plaintiff may recover lost profit damages in the context of a new business venture or a prospective business transaction that failed. *See id.* at 183–84; *see also* Restatement (Second) of Torts § 912, cmt. d (Am. L. Inst. 1979) (discussing proof of lost profits where one party "has tortiously prevented another from entering into or continuing a business or entering into a particular transaction" and in the context of a new business); Restatement (Second) of Contracts § 352 cmt. b (Am. L. Inst.

1981) (discussing proof of lost profits in the context of a new business venture). "[A]s is the case with an established business, reasonable certainty may be provided when the plaintiff devises some reasonable method of computing his net loss." *Rancho Pescado*, 140 Ariz. at 184 (internal citation omitted).

¶27 We recognize, however, "that it is substantially more difficult for a new business to establish lost profits damages with reasonable certainty than it is for an established business to do so." *Schwartz v. Menas*, 279 A.3d 436, 438 (N.J. 2022); *see* Restatement (Second) of Contracts § 352 cmt. b ("[I]f the business is a new one or if it is a speculative one that is subject to great fluctuations in volume, costs or prices, proof will be more difficult."). "Nevertheless, damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." Restatement (Second) of Contracts § 352 cmt. b. "A trial court should carefully scrutinize a new business's claim that a defendant's tortious conduct or breach of contract prevented it from profiting from an enterprise in which it has no experience and should bar that claim unless it can be proven with reasonable certainty." *Menas*, 279 A.3d at 438; *see also* Restatement (Second) of Torts § 912, cmt. d ("Because of a justifiable doubt as to the success of new and untried enterprises, more specific evidence of their probable profits is required than when the claim is for harm to an established business.").[4]

## B. Plaintiffs' Evidence Regarding The Reasonable Certainty Of Lost Profit Damages

¶28 Where, as here, a plaintiff claims a loss of future profits arising from a failed business transaction, we first evaluate whether the plaintiff has presented evidence that the parties to the prospective transaction had agreed on material terms such that the transaction was reasonably certain to occur. *See Great W. Bank v. LJC Dev., LLC*, 238 Ariz. 470, 481 ¶ 36 (App. 2015) ("Both the existence and amount of lost profits present questions of fact which must be proven with reasonable certainty."); *S. Union Co. v. Sw. Gas Corp.*, 180 F. Supp. 2d 1021, 1050 (D. Ariz. 2002) (explaining that plaintiff

---

[4] "We generally follow Restatement principles when they reflect sound legal policy and no contrary controlling authority exists." *Legacy Found. Action Fund v. Citizen Clean Elections Comm'n*, 254 Ariz. 485, 491 ¶ 18 (2023).

"offers insufficient evidence to establish the terms of a consummated merger with" defendant, and "[s]uch a showing is an essential starting point to any reasonable computation of alleged lost profits").

¶29       Without evidence of agreement on material terms, a claim for lost profit damages from an unconsummated transaction is too speculative to support recovery. *See McNutt Oil & Refin. Co.*, 79 Ariz. at 34 (explaining that a "loss of future profits . . . cannot be predicated upon conjecture or speculation"); *see also S. Union Co.*, 180 F. Supp. 2d at 1051 ("The indeterminacy concerning this basic merger term illustrates that [plaintiff's] claim for lost profit damages is too speculative to support recovery."); *CGI Fed. Inc. v. FCi Fed., Inc.*, 814 S.E.2d 183, 189 (Va. 2018) ("Taken together, these provisions make clear the parties never agreed to the final terms of a subcontract and expressly conditioned the formation of a subcontract on future events and negotiations . . . . At most, the amended teaming agreement imposed a framework for good faith negotiations of a final subcontract."); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 50 (Tex. 1998) (denying claim for lost profits "based on an entirely hypothetical, speculative bargain that was never struck and would not have been consummated").

¶30       If the plaintiff establishes that the transaction was reasonably certain to occur because the parties had agreed on material terms, we next determine whether the plaintiff has proven the amount of lost profit damages with reasonable certainty. *See Gilmore*, 95 Ariz. at 36.

¶31       In this case, Plaintiffs claim that Loeb & Loeb's unlawful conduct caused them to suffer $5 million in lost profit damages. In support, Plaintiffs rely heavily on O'Flynn's testimony that he was willing to make a $5 million initial payment in conjunction with a licensing deal.

¶32       In response, Loeb & Loeb contends that O'Flynn and McAlister were in fundamental disagreement as to various material terms of the prospective licensing deal. In particular, O'Flynn and McAlister disagreed about both the size of the initial payment that O'Flynn would make upon execution and also the amount and timing of subsequent payments. Therefore, according to Loeb & Loeb, the transaction was not reasonably certain to occur, and Plaintiffs' claim for lost profit damages fails.

¶33     At O'Flynn's deposition, he described the status of his negotiations with McAlister regarding payments under the prospective licensing deal.  O'Flynn testified that he was engaged in "back and forth" negotiations with McAlister.  They had an "oral outline" and "a rough figure," but "couldn't come to [a] final number on it" as McAlister was still negotiating for a higher number and O'Flynn for a lower number. O'Flynn's testimony continued as follows:

> Q. Okay. So as far as you got, it was when you put the pens down or pencils down, that was when Roy was negotiating for a higher number and you were negotiating for a lower number?
> A. Yeah. I think it was initially 5 million upfront, and then maybe 15—15 to 20 or somewhere in the middle for a yearly —yearly royalty fee. But there was a lot of back and forth on phone calls saying—obviously, I was looking for the under, and Roy was looking for the over. But we would have settled probably somewhere in the middle.
>
> Q. But you never settled on a number; right?
> A. No. But there was a range. There was a range.
>
> Q. Right. And was the range—but I'm saying is you never got past the range and agreed upon the final number; correct?
> A. Yeah. We didn't—we didn't sign off on a number. We didn't sign off on a number.
>
> Q. My question was: You never agreed on a final number? When you said pencils down, you were still discussing a range; correct?
> A. We were still discussing a tighter range, I suppose, yeah.
>
> Q. And was that range—what was that range at that time?
> A. I think it was—as I said, I think it was between—whether it was five for the initial upfront and between 15 and—and 20 for ongoing royalty fee post-construction I think it was. So the facility obviously had to be built, revenue generated instead of paying ongoing royalty fee in the construction phase,

which would have been—would have been, obviously, unattainable, from my perspective.

Q. Okay. And when you say five upfront, was that 5 million upfront to Roy McAlister?
A. To McAlister Technologies, yeah.

Q. Okay. And was that a number that you were still negotiating or was that the highest you were willing to consider?
A. No, that was fine. It was more the—it was more the—the post-construction royalty fee that—that we were negotiating on.

Q. And so in your mind, it would have been 5 million upfront, and then any further fees would come once the business was revenue-generating; correct?
A. Post-construction, yeah.

Q. And when you say "post-construction," does that also mean post-commercialization?
A. Operating.

Q. The business would be operating?
A. Correct.

Q. And when you say the business would be operating, does it also mean revenues coming in?
A. That's correct.

### 1. Amount Of Initial Payment

¶34       O'Flynn testified "that was fine" when referring to him making an initial payment of $5 million under the licensing deal. But this testimony stands in stark contrast with McAlister's testimony about what he demanded for an initial payment. McAlister did not testify that he expected an initial payment of $5 million from O'Flynn or any other prospective licensee. Instead, McAlister testified that his "universal agreement always required the licensee to pay $20 million at the beginning

of the agreement," which meant "essentially a[t] signing." Indeed, when questioned about a draft licensing agreement that Plaintiffs produced in this case, McAlister reiterated that he required a $20 million payment upon signing and he "wouldn't give a license without them paying at the beginning of the license." Notably, this draft licensing agreement does not reference a $5 million initial payment.

¶35 Moreover, the record contains emails from O'Flynn indicating that he had "begun the process of developing a business plan" and providing "an outline of a plan to move forward." But these emails do not reference a $5 million initial payment, much less reflect any sort of agreement between O'Flynn and McAlister on the payment terms of a licensing deal.

¶36 At bottom, McAlister's universal expectation was that he would receive a $20 million payment immediately upon the signing of a license agreement and before a product was commercialized. Plaintiffs have not cited any contemporaneous documents or testimony from McAlister demonstrating that he was willing to accept or expected a $5 million initial payment. Accordingly, on this record, McAlister and O'Flynn were not close to an agreement on a $5 million initial payment.

## 2. Amount Of Annual Payments

¶37 In addition, the evidence demonstrates that O'Flynn and McAlister were still negotiating the amount of the annual payments under the licensing deal, and this material term was still unsettled at the time of Loeb & Loeb's alleged misconduct.

¶38 McAlister testified that he has "always required the licensee to pay $20 million at the beginning of the agreement" and "$20 million a year every year after, or they lost the license." And in fact, McAlister's expected $20 million annual payment is consistent with the unsigned draft licensing agreements between O'Flynn and McAlister/MT that Plaintiffs produced in this case. Those draft agreements provide that O'Flynn would pay an annual license fee of $20 million.

¶39 O'Flynn's testimony was remarkably different on this term. O'Flynn testified that he was at "15 million euros a year" and McAlister "was at $20 million a year." O'Flynn indicated that he and McAlister

"would have settled *probably somewhere in the middle*," and "*I believe* the negotiated settlement . . . in between those *ranges* . . . would have been achieved." (Emphasis added.) But O'Flynn did not reference any evidence supporting his belief. And his additional testimony regarding payments under the agreement—using terminology such as "maybe" and "I think"—further supports the speculative nature of whether he and McAlister would have resolved this material term. At bottom, McAlister wanted to be paid $20 million per year and O'Flynn expected to pay $15 million per year, and there is no evidence that this $5 million annual payment disparity was close to resolution.

### 3. Timing Of Annual Payments

¶40　　　　Loeb & Loeb contends that there was another fundamental disagreement about the timing of O'Flynn's annual payments. According to Loeb & Loeb, McAlister demanded $20 million every year of the agreement (even before construction and commercialization of the product), while O'Flynn was only willing to begin making subsequent payments after the business succeeded in developing a product and generating revenue.

¶41　　　　As noted, McAlister testified that he has "always required the licensee to pay $20 million at the beginning of the agreement" and "$20 million a year every year after, or they lost the license." Also, McAlister's draft licensing agreements with O'Flynn included an annual license fee of $20 million at the beginning of each year. Under McAlister's deal structure, O'Flynn would have been required to make these payments even before any revenue was generated from the business.

¶42　　　　O'Flynn's testimony differed significantly regarding the timing of his annual payments under a licensing deal. O'Flynn testified that he would have agreed to an initial payment of $5 million, but he would not have agreed to pay a $15 to $20 million annual payment until "post-construction"—that is, after the facility was built, the business was operating, and revenue was being generated. O'Flynn was not willing to pay an ongoing annual payment when the business was still in the construction phrase, as this was "unattainable" from his perspective. Notably, O'Flynn testified that it would take four years before the new business venture would be operational and generating revenue. O'Flynn

also testified that this post-construction annual fee was still a point of negotiation with McAlister.

¶43 In sum, Plaintiffs have not established that the material terms of a licensing agreement with O'Flynn were sufficiently resolved such that the transaction was reasonably certain to occur. It is speculative whether O'Flynn and McAlister would have agreed on these unresolved terms.

### 4. The Nature Of The Proposed $5 Million Initial Payment

¶44 Plaintiffs claim they are entitled to $5 million in lost profit damages. In doing so, they characterize O'Flynn's testimony as a declaration that he would pay "$5 million up front without contingencies." Plaintiffs contend this $5 million payment was subject only to one contingency—that MT's name was on the patent documents as owner. But the record refutes this claim.

¶45 As discussed, O'Flynn and McAlister were not close to an agreement on the initial payment amount. But even assuming they would have agreed to a $5 million initial payment, this payment was not a standalone agreement that would have resulted in $5 million of pure profit to Plaintiffs. O'Flynn was not agreeing to pay $5 million for nothing in return. Instead, the parties were negotiating one licensing agreement, with the initial payment being just one of many terms in the agreement. Thus, any initial payment—$5 million or otherwise—was contingent on McAlister and O'Flynn reaching agreement on all final terms and executing the licensing agreement. But McAlister and O'Flynn had fundamental disagreements about several material terms, including the amount and timing of O'Flynn's annual payments under a licensing deal.

¶46 Plaintiffs have failed to meet their burden of establishing that O'Flynn and McAlister had agreed on material terms such that it was reasonably certain they would have executed a licensing agreement with a $5 million initial payment term. O'Flynn's mere expectation of a $5 million initial payment does not equate to $5 million in lost profits to Plaintiffs. Thus, Plaintiffs are not entitled to $5 million in lost profit damages.

## C.    Trespass To Chattel Claim

¶47        We also granted review on the issue of whether the court of appeals erred in recognizing a claim for trespass to chattel based on Loeb & Loeb's alleged electronic interference with McAlister's patent applications. However, because Plaintiffs have not established lost profit damages—the only type of damages they seek in this case—their claim for trespass to chattel necessarily fails. *See Koepnick v. Sears Roebuck & Co.*, 158 Ariz. 322, 330–32 (App. 1988) (citing Restatement (Second) of Torts §§ 217, 218, 221) (discussing the elements of a trespass to chattel claim, including the requirement that plaintiff was harmed by defendant's conduct). Accordingly, we need not reach the issue of whether electronic interference with a patent application can give rise to a trespass to chattel claim.

### CONCLUSION

¶48        We conclude that the court of appeals erred in reversing summary judgment in favor of Loeb & Loeb on Plaintiffs' claim for $5 million in lost profit damages, and erred in reversing summary judgment in favor of Loeb & Loeb on Plaintiffs' trespass to chattel claim. Accordingly, we vacate paragraphs 36 to 44 of the court of appeals' memorandum decision, as well as the portions of paragraphs 2 and 53 that address Plaintiffs' trespass to chattel claim and their alleged $5 million in lost profit damages.

¶49        We affirm the superior court's entry of summary judgment in favor of Loeb & Loeb on Plaintiffs' alleged lost profit damages. We also affirm on other grounds the entry of summary judgment in favor of Loeb & Loeb on Plaintiffs' trespass to chattel claim. *See Cross v. Cross*, 94 Ariz. 28, 31 (1963) (noting that "we will consider any legal theory within the issues and supported by the evidence which tends to support and sustain the judgment of the trial court").

¶50        As discussed, the court of appeals reversed the superior court's entry of summary judgment in favor of Loeb & Loeb on the slander of title claim. *McAlister*, 2024 WL 372214, at *1 ¶ 2, *8–10 ¶¶ 45–53. We were not asked to review the court of appeals' decision on the slander of title claim. We remand to the superior court for further proceedings consistent with this Opinion.